# FLORIDA *v.* WELLS

No. 88–1835.   Argued December 4, 1989—Decided April 18, 1990·

1

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 5. BLACKMUN, J., *post*, p. 10, and STEVENS, J., *post*, p. 12, filed opinions concurring in the judgment.

*Michael J. Neimand*, Assistant Attorney General of Florida, argued the cause for petitioner. With him on the brief were *Robert A. Butterworth*, Attorney General, and *Enoch J. Whitney*.

*Huntley Johnson* argued the cause for respondent. With him on the brief was *Fletcher N. Baldwin, Jr.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

A Florida Highway Patrol trooper stopped respondent Wells for speeding. After smelling alcohol on Wells' breath, the trooper arrested Wells for driving under the influence. Wells then agreed to accompany the trooper to the station to take a breathalyzer test. The trooper informed Wells that the car would be impounded and obtained Wells' permission to open the trunk. At the impoundment facility, an inventory search of the car turned up two marijuana cigarette butts in an ashtray and a locked suitcase in the trunk. Under the trooper's direction, employees of the facility forced open the suitcase and discovered a garbage bag containing a considerable amount of marijuana.

Wells was charged with possession of a controlled substance. His motion to suppress the marijuana on the ground that it was seized in violation of the Fourth Amendment to the United States Constitution was denied by the trial court.

He thereupon pleaded *nolo contendere* to the charge but reserved his right to appeal the denial of the motion to suppress. On appeal, the Florida District Court of Appeal for the Fifth District held, *inter alia*, that the trial court erred in denying suppression of the marijuana found in the suitcase. Over a dissent, the Supreme Court of Florida affirmed. 539 So. 2d 464, 469 (1989). We granted certiorari, 491 U. S. 903 (1989), and now affirm (although we disagree with part of the reasoning of the Supreme Court of Florida).

The Supreme Court of Florida relied on the opinions in *Colorado* v. *Bertine*, 479 U. S. 367 (1987); *id.*, at 376 (BLACKMUN, J., concurring). Referring to language in the *Bertine* concurrence and a footnote in the majority opinion, the court held that

> "[i]n the absence of a policy specifically requiring the opening of closed containers found during a legitimate inventory search, *Bertine* prohibits us from countenancing the procedure followed in this instance." 539 So. 2d, at 469.

According to the court, the record contained no evidence of any Highway Patrol policy on the opening of closed containers found during inventory searches. *Ibid.* The court added, however:

> "The police under *Bertine* must mandate either that all containers will be opened during an inventory search, or that no containers will be opened. There can be no room for discretion." *Ibid.*

While this latter statement of the Supreme Court of Florida derived support from a sentence in the *Bertine* concurrence taken in isolation, we think it is at odds with the thrust of both the concurrence and the opinion of the Court in that case. We said in *Bertine:*

> "Nothing in [*South Dakota* v.] *Opperman*[, 428 U. S. 364 (1976),] or [*Illinois* v.] *Lafayette*[, 462 U. S. 640 (1983),] prohibits the exercise of police discretion so long as that

discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." 479 U. S., at 375.

Our view that standardized criteria, *ibid.*, or established routine, *Illinois* v. *Lafayette*, 462 U. S. 640, 648 (1983), must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime," *Bertine*, 479 U. S., at 376 (BLACKMUN, J., concurring).

But in forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical "all or nothing" fashion. "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.*, at 372; see also *South Dakota* v. *Opperman*, 428 U. S. 364, 369 (1976). A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.

In the present case, the Supreme Court of Florida found that the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered dur-

ing an inventory search. We hold that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment and that the marijuana which was found in the suitcase, therefore, was properly suppressed by the Supreme Court of Florida. Its judgment is therefore

*Affirmed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

I agree with the Court that the judgment of the Florida Supreme Court should be affirmed because the Florida Highway Patrol had *no* policy at all with respect to opening closed containers. As the majority recognizes, see *ante,* at 4 and this page, the search was therefore unconstitutional under any reading of our cases. See *Colorado* v. *Bertine,* 479 U. S. 367, 374 (1987) (opening closed container found in a vehicle during an inventory search constitutional only because policy mandated opening of such containers). Our cases have required that inventory searches be "sufficiently regulated," *ante,* this page, so as to avoid the possibility that police will abuse their power to conduct such a search. See *South Dakota* v. *Opperman,* 428 U. S. 364, 384 (1976) (Powell, J., concurring) ("[N]o significant discretion is placed in the hands of the individual officer: he usually has no choice as to the subject of the search or its scope").

The facts of this case demonstrate a prime danger of insufficiently regulated inventory searches: police may use the excuse of an "inventory search" as a pretext for broad searches of vehicles and their contents. In this case, there was no evidence that the inventory search was done in accordance with *any* standardized inventory procedure. Although the State characterized the search as an inventory search in the trial court, it did not point to any standard policy governing inventory searches of vehicles (much less to any policy governing the opening of closed containers) until the case reached the Florida Supreme Court. At that time, which was after our

decision in *Bertine, supra,* the Florida Highway Patrol entered the case as *amicus curiae* and argued that Chapter 16 of the "Florida Highway Patrol Forms and Procedural Manual" contained the standard policy that guided the conduct of the search in this case. The Florida Supreme Court concluded that the manual did not provide any policy for the opening of closed containers. App. 256. But it now appears that the Florida Supreme Court may have been under the misapprehension that the manual was in effect at the time of the search in this case. See Tr. of Oral Arg. 30–31. The State conceded at oral argument before this Court that the manual was *not* in effect at the time of the search in this case, but argued nonetheless that the officer had performed the search according to "standard operating procedures" that were later incorporated into the Highway Patrol Manual. See *id.,* at 17 ("The rules and regulations which . . . came into effect shortly thereafter, merely codified what the Florida Highway Patrol was doing to all procedures *[sic]* during that period of time"). But the State did not offer any evidence at the suppression hearing to support a finding that Trooper Adams performed the inventory according to "standard operating procedures." Trooper Adams testified that he asked his immediate superior whether he should impound and inventory the car but that his superior left it to Adams' discretion, stating that he found nothing suspicious about the car. Trooper Adams testified that he "took it upon [himself] to go ahead and have the car towed." App. 88. He also testified that he thought that opening the suitcase was part of a proper inventory but that he did not ask anyone else's opinion until after the search was completed. *Id.,* at 82–83. He testified "Well, I had to take my chances." *Id.,* at 83.

In addition, there was no evidence that an inventory was actually done in this case: the State introduced neither an inventory sheet nor any testimony that the officer actually inventoried the items found in respondent's car. Tr. of Oral Arg. 5, 25–26. Rather, the testimony at the suppression

hearing suggests that the officer used the need to "inventory" as an excuse to search for drugs. The testimony establishes that after arresting respondent for driving under the influence of alcohol and accompanying him to the station house, Trooper Adams returned to the impound lot to conduct the inventory search at 1:30 a.m. Grover Bryan, who assisted the state trooper with the inventory, testified at the hearing that Trooper Adams told him that "he wanted to inventory the car good, he wanted to go through it real good because he felt that there was drugs in it." App. 141. According to Bryan, Adams' desire to inventory the car stemmed from the fact that there was a large amount of cash lying on the floor of the car when respondent was arrested. Bryan testified that Adams insisted that contraband would be found in the car because "[t]here ain't nobody runs around with that kind of money in the floorboard unless they're dealing drugs or something like that." *Id.*, at 142; see *ibid.* ("[H]e felt that the money that they had found was from a drug deal"). When they finally found the locked suitcase in the trunk, Bryan testified that Adams "want[ed] in the suitcase" because he "had a strong suspicion there was drugs in that car and it was probably in that suitcase." *Id.*, at 145. The men then spent 10 minutes prying open the lock on the suitcase with two knives. App. 82, 147. Bryan testified that once they opened the suitcase and found a bag of marijuana inside, "[Adams] was quite excited. He said 'there it is.'" *Id.*, at 147. See also Tr. of Oral Arg. 24 ("Well, to be quite frank, the officer as he got further and further along in his search, got hungrier and hungrier").

The majority finds it unnecessary to recount these facts because it affirms the Florida Supreme Court on the narrow ground, clearly established by *Opperman* and *Bertine*, that police may not be given total discretion to decide whether to open closed containers found during an inventory search. With this much I agree. Like JUSTICE BLACKMUN, *post*, at 11–12, however, I cannot join the majority opinion because it

goes on to suggest that a State may adopt an inventory policy that vests individual police officers with *some* discretion to decide whether to open such containers. See *ante,* at 4 ("A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself"). This suggestion is pure dictum given the disposition of the case. But as JUSTICE BLACKMUN notes, *post,* at 11, there is a danger that this dictum will be relied on by lower courts in reviewing the constitutionality of particular inventory searches, or even by local policymakers drafting procedures for police to follow when performing inventories of impounded vehicles. Thus, I write separately to emphasize that the majority's suggestion is inconsistent with the reasoning underlying our inventory search cases and relies on a mischaracterization of the holding in *Bertine.*

Our cases clearly hold that an inventory search is reasonable under the Fourth Amendment only if it is done in accordance with standard procedures that *limit* the discretion of the police. See *Opperman,* 428 U. S., at 384 (Powell, J., concurring). In *Bertine,* the Court held that the police may open closed containers found within an impounded vehicle only if the inventory policy mandates the opening of all such containers. See 479 U. S., at 374, n. 6 ("We emphasize that, in this case, the trial court found that the Police Department's procedures mandated the opening of closed containers and the listing of their contents"). Contrary to the majority's assertion today, *ante,* at 3, *Bertine* did not establish that police may exercise discretion with respect to the opening of closed containers during an inventory search. The statement in *Bertine* that "[n]othing in *Opperman* . . . prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria," 479 U. S., at 375, was made in response to an argument that the inventory search was unconstitutional because the police had some discretion to determine whether to *impound* the car. The Court's conclu-

sion that the opening of defendant's backpack was constitutional was clearly premised on the city's inventory policy that left no discretion to individual police officers as to the opening of containers found inside a car once it was impounded. See *id.*, at 374, n. 6. JUSTICE BLACKMUN's concurrence in *Bertine* could not be clearer: "[I]t is permissible for police officers to open closed containers in an inventory search *only if* they are following standard police procedures that mandate the opening of such containers in *every* impounded vehicle." *Id.*, at 377 (emphasis added).[1]

Opening a closed container constitutes a great intrusion into the privacy of its owner even when the container is found in an automobile. See *Arkansas* v. *Sanders*, 442 U. S. 753, 762–764 (1979); *United States* v. *Chadwick*, 433 U. S. 1, 13 (1977). For this reason, I continue to believe that in the absence of consent or exigency, police may not open a closed container found during an inventory search of an automobile. See *Bertine*, 479 U. S., at 387 (MARSHALL, J., joined by BRENNAN, J., dissenting).[2] In any event, in *Bertine*, the

---

[1] Indeed, the majority's suggestion that police may be vested with discretion to open a container "in light of the nature of the search and characteristics of the container itself," *ante*, at 4, flatly contradicts the reasoning in *Bertine*. In that case, the Court rejected the argument that police are required to "weigh the strength of the individual's privacy interest in the container against the possibility that the container might serve as a repository for dangerous or valuable items." *Bertine*, 479 U. S., at 374. The Court found such a rule unworkable for " 'it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which container or items may be searched and which must be sealed as a unit.'" *Id.*, at 375, quoting *Illinois* v. *Lafayette*, 462 U. S. 640, 648 (1983); see also 479 U. S., at 375 ("We reaffirm these principles here: [a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront") (internal quotations omitted).

[2] The Court has recognized that an inventory search potentially can serve three governmental interests: protection of the owner's valuables, protection of the police from false claims of theft or damage, and protection

Court recognized that opening a container constitutes such a great intrusion that the discretion of the police to do so must be circumscribed sharply to guard against abuse. If the Court wishes to revisit that holding, it must wait for another case. Attempting to cast doubt on the vitality of the holding in *Bertine* in this otherwise easy case is not justified.

JUSTICE BLACKMUN, concurring in the judgment.

I agree with the Court that the judgment of the Supreme Court of Florida is to be affirmed. If our cases establish anything, it is that an individual police officer cannot be given complete discretion in choosing whether to search or to leave undisturbed containers and other items encountered during an inventory search. See *Colorado* v. *Bertine*, 479 U. S. 367, 374, n. 6 (1987); *South Dakota* v. *Opperman*, 428 U. S. 364 (1976). Here, given the complete discretion Florida Highway Patrol troopers enjoyed to open or not to open closed containers, the evidence in question properly was suppressed. I do not join the majority opinion, however, because, instead of ending the case at that point, it continues with language, unnecessary on the facts of this case, concerning the extent to which a policeman, under the Fourth Amendment, *may* be given discretion in conducting an inventory search.

The majority disagrees with the Florida Supreme Court's statement that a police department must have a policy which "mandate[s] either that all containers will be opened during

of the police from danger. *South Dakota* v. *Opperman*, 428 U. S. 364, 369 (1976); *id.*, at 378 (Powell, J., concurring). The Court has concluded that routine inventory searches are constitutional because these government interests outweigh an individual's diminished expectation of privacy in a car. *Id.*, at 378–379 (Powell, J., concurring). I do not agree that these interests justify the opening of a closed container in which an individual retains a significant expectation of privacy. See *Bertine, supra*, at 382–387 (MARSHALL, J., dissenting). Indeed, I do not see how the treatment of the luggage in this case—prying open the lock with two knives—served any of these governmental interests.

an inventory search, or that no containers will be opened." *Ante,* at 3. The majority concludes that the Fourth Amendment does not impose such an "all or nothing" requirement. With this much I agree. A State, for example, consistent with the Fourth Amendment, probably could adopt a policy which requires the opening of all containers that are not locked, or a policy which requires the opening of all containers over or under a certain size, even though these policies do not call for the opening of all or no containers. In other words, a State has the discretion to choose a scheme that lies somewhere between the extremes identified by the Florida Supreme Court.

It is an entirely different matter, however, to say, as this majority does, that an individual policeman may be afforded discretion in conducting an inventory search. The exercise of discretion by an individual officer, especially when it cannot be measured against objective, standard criteria, creates the potential for abuse of Fourth Amendment rights our earlier inventory-search cases were designed to guard against. Thus, when the majority states that a "police officer may be allowed sufficient *latitude* to determine whether a particular container should or should not be opened in light of the nature of the search," and that it is permissible for a State "to *allow* the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors," *ante,* at 4 (emphasis added), the majority is doing more than refuting the Florida Supreme Court's all-or-nothing approach; it is opining about a very different and important constitutional question not addressed by the state courts here and not raised by the circumstances of the case. Although the majority's statements on the issue perhaps are to be regarded as no more than dicta, they nonetheless are problematic inasmuch as they may be taken out of context or misinterpreted by policymakers and trial courts. Because, as noted above, the complete discretion afforded Florida policemen in this case renders the search at issue

undeniably unconstitutional, I see no reason for the Court to say anything about precisely *how much, if any*, discretion an individual policeman constitutionally may exercise.

JUSTICE STEVENS, concurring in the judgment.

While I agree with JUSTICE BLACKMUN's opinion, I think additional criticism of the Court's activism is appropriate. One must wonder why this case merited a grant of certiorari. The judgment of the Florida Supreme Court was obviously correct. Its opinion contained a minor flaw, as countless opinions do. Unless we are to become self-appointed editors of state-court opinions in the criminal law area, that is surely an insufficient reason for exercising our certiorari jurisdiction.

The flaw, of course, might impose a stricter standard for the conduct of inventory searches in Florida than the Federal Constitution actually requires, but there is no suggestion that the extra layer of protection provided to Florida citizens by the Florida Supreme Court will hamper law enforcement in that State. Apparently the mere possibility of a minor burden on law enforcement interests is enough to generate corrective action by this Court.

But then, as JUSTICE BLACKMUN properly observes, the Court does not content itself with commenting on the flaw in the Florida Supreme Court's opinion. Instead, it plunges ahead with a flawed opinion of its own. While purportedly reaffirming the requirement of "standard criteria" to control police discretion in conducting inventory searches, see *Colorado* v. *Bertine*, 479 U. S. 367, 375 (1987), the Court invites the State to allow their officers discretion to open—or not to open—"closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors." *Ante*, at 4. Thus, luggage, briefcases, handbags, brown paper bags, violin cases—indeed, virtually all containers except goldfish bowls—could be opened at the whim of the officer, whether locked or unlocked. What is left for the "standard criteria"?

It is a proper part of the judicial function to make law as a necessary by-product of the process of deciding actual cases and controversies. But to reach out so blatantly and unnecessarily to make new law in a case of this kind is unabashed judicial activism.