834 P.2d 892

**STATE of Idaho, Plaintiff–Respondent,**

**v.**

**Timothy BRAY, Defendant–Appellant.**

**No. 18982.**

Court of Appeals of Idaho.

May 4, 1992.

Petition for Review Denied Aug. 28, 1992.

Donald A. Lassaw, Boise, for defendant-appellant.

Larry EchoHawk, Atty. Gen., Thomas P. Watkins, Deputy Atty. Gen., (argued) for plaintiff-respondent.

SWANSTROM, Judge.

Timothy Bray conditionally pled guilty under I.C.R. 11 to possession of a controlled substance with intent to deliver, reserving his right to appeal from a district court order denying his motion to suppress. The issue he presents in this appeal is whether his Fourth Amendment rights against unreasonable searches and seizures were violated when a police officer, responding to a motorcycle accident, conducted an inventory search of two saddlebags belonging to Bray and found illegal drugs. We agree with the district court's conclusion that the inventory search was the reasonable exercise of a police caretaking function, not proscribed by the Fourth Amendment, and we affirm.

## FACTS AND PROCEDURAL BACKGROUND

On August 24, 1988, Bray was riding a motorcycle on state Highway 55 near the top of Horseshoe Bend Hill when he lost control of the motorcycle. Idaho State Police Officer George Stokesberry was the first officer to arrive at the scene of the accident. When Stokesberry arrived, a number of people were gathered around the accident scene, and Bray was sitting on a guardrail receiving medical attention from an EMT who had happened to pass by. The motorcycle which Bray had been riding had been picked up and parked on its kickstand by the side of the road and a number of items which had fallen off of the motorcycle during the crash had also been picked up and placed on top of the motorcycle. Stokesberry observed that Bray was covered with dirt and blood and had sustained various lacerations and abrasions about his head, face, and hands. Stokesberry also observed that Bray had a severe injury to his foot where the ·motorcycle's footpeg had gone through his boot. As a result of the foot injury, Bray was unable to walk. Stokesberry learned that an am-

bulance had already been called to the scene.

In conversing with Bray, Stokesberry noted that Bray was very concerned about the motorcycle and that Bray repeatedly expressed the desire to be left alone and to ride away from the scene on his own. Having determined, however, that Bray would pose a risk to himself and others if allowed to operate the motorcycle in his present condition, Stokesberry informed Bray that he would not be allowed to operate the motorcycle and that a wrecker had been called to retrieve it. Ultimately, Bray consented to being transported by ambulance to a hospital for treatment of his injuries.

Before Bray was placed in the ambulance, one of the ambulance attendants advised Stokesberry that Bray was carrying a gun in his belt, and requested that Stokesberry confiscate the gun. Stokesberry did so, and asked Bray if he had any other weapons in his possession. Bray replied that he had a .357 magnum in one of the motorcycle's saddlebags.

At the time of this incident, the official policy regarding inventory searches of impounded vehicles set forth in the Idaho State Police Operations Manual provided that "[i]n every case, all impounded vehicles must be inventoried by the impounding officer on ISP Form 112 prior to the time the wrecker operator takes control of the vehicle." Pursuant to this policy, Stokesberry performed an inventory of the items contained within and on the motorcycle. Stokesberry commenced by inventorying the contents of the motorcycle's two leather saddlebags. The lids of these saddlebags were unlocked but fastened by leather straps and buckles. Upon inventorying the saddlebags, Stokesberry found, among other things, a .357 magnum revolver; six bottles containing sodium chloride (a chemical used to manufacture methamphetamine); and several plastic bags, containing substances which appeared to be methamphetamine, marijuana, and LSD. One of the plastic bags containing the methamphetamine also contained three bundles of cash, each bundle containing $1,000. Upon finding what he believed to be controlled substances, Stokesberry, pursuant to department policy, stopped the inventory and radioed the Bureau of Narcotics for assistance in investigating the matter. Stokesberry waited to resume the inventory until after the narcotics investigator had arrived and had completed his investigation at the scene.

The Bureau of Narcotics dispatched investigator David Kynoch, who conducted a number of field tests at the scene to make a preliminary determination as to the nature of the substances found in Bray's saddlebags. Kynoch's tests indicated that the plastic bags contained methamphetamine, LSD, and marijuana. Kynoch took the items containing the contraband back to the laboratory for further testing.

After Kynoch removed the items containing the contraband, Stokesberry finished inventorying the property on the motorcycle, noting such items as a pair of binoculars, a scanner that was evidently broken during the accident, thirty-four rounds of .38 ammunition, some .22 magnum ammunition, a red leather coat, chaps, a yellow rain coat and pants, miscellaneous clothing, three fishing poles and reels which apparently had also been broken during the accident, a 35mm camera, and tools. Stokesberry took these items to a state police warehouse. The motorcycle was initially transported to the storage facilities of the wrecker, and was later transported to the state police warehouse.

Bray was subsequently charged with two counts of possession of a controlled substance with intent to deliver, one count of concealing a deadly weapon, and one count of basic rule infraction. A preliminary hearing was held, after which Bray was bound over for trial in the district court. Bray then filed a motion to suppress in the district court, alleging that the evidence seized from the saddlebags and admitted at the preliminary hearing should have been suppressed because the inventory of the saddlebags violated his Fourth Amendment rights against unreasonable searches and seizures. After a hearing on the motion, the district court issued a memorandum decision and order denying Bray's motion.

Later, pursuant to a plea agreement, Bray entered a conditional plea of guilty to one count of possession of a controlled substance with intent to deliver, reserving the right to appeal the denial of his motion to suppress. The state dismissed the remaining counts against Bray. Bray received a unified sentence of five years with a one-year fixed term of confinement. The district court retained jurisdiction over Bray for the first 120 days pursuant to I.C. § 19–2601, and stayed execution of the sentence during the pendency of this appeal.

## STANDARD OF REVIEW

■ The question we are asked to decide is whether the district court erred in denying Bray's motion to suppress. The standard for reviewing orders denying motions to suppress evidence is well established; we will not disturb the district court's determinations of fact which are based upon substantial evidence, but we exercise free review of the lower court's decision as to whether constitutional requirements have been satisfied in light of the facts found. *State v. Culbertson,* 105 Idaho 128, 666 P.2d 1139 (1983); *State v. Rusho,* 110 Idaho 556, 716 P.2d 1328 (Ct.App.1986).

## ANALYSIS

■ In its memorandum decision, the district court determined that because Bray was transported to Boise in an ambulance and the motorcycle was left standing upright near the edge of Highway 55, Stokesberry "had the authority and in fact even the responsibility of removing the motorcycle to a place of safe keeping." This determination is supported by substantial evidence in the record. Stokesberry testified that he refused to allow Bray to operate the motorcycle after the accident because, in his judgment, Bray's injuries left him physically unable to safely do so. The evidence also shows that after the accident, the motorcycle was parked upright near the edge of Highway 55. Various items which had fallen off during the accident were stacked on top of the motorcycle. Bray did not attempt to entrust the motorcycle to anyone at the accident scene. He

testified, rather, that he told Stokesberry to leave the motorcycle where it was; that he had friends who were coming to pick it up. The record shows, however, that during the approximately two and one-half hours that Stokesberry was at the scene of the accident before the motorcycle was taken away, no one associated with Bray came to pick up either the motorcycle or the property found thereon.

■ Once a decision is made to impound a vehicle, an inventory search of the vehicle is permissible. *State v. Smith,* 120 Idaho 77, 80, 813 P.2d 888, 891 (1991). Under I.C. § 49–662(2) and (3)(b),

(2) Any peace officer is authorized to remove or cause to be removed to a place of safety any unattended vehicle illegally left standing upon any highway in a position or under circumstances as to obstruct the normal movement of traffic. (3) Any peace officer is authorized to remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when:

(b) The person or persons in charge of the vehicle are unable to provide for its custody or removal[.]

We conclude that the evidence adduced in this case and the law of Idaho both support the district court's conclusion that Stokesberry's impounding of the motorcycle was legal and proper. This conclusion is also consistent with constitutional law. The Supreme Court has stated that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). *See also State v. Smith, supra.*

■ Having affirmed the district court's conclusion that impounding Bray's motorcycle was proper, we must consider whether the subsequent inventory of the motorcycle performed by Stokesberry was also proper. This question requires us to determine whether, consistent with the Fourth Amendment, it is reasonable for police, as part of a routine administrative procedure,

to open and search the saddlebags of a motorcycle that has been lawfully impounded by the police. It is important to note, initially, that

> inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment. The policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause:
>
>> The standard of probable cause is peculiarly related to criminal investigations, not routine, non-criminal procedures.... The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.

*Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). In this case, Bray has alleged that the inventory of his saddlebags was merely a pretext to allow Stokesberry to search for incriminating evidence. The district court found, however, that Bray failed to make a convincing showing of bad faith by the police officers involved.

This finding is supported by the evidence, or lack thereof, in the record. To support his allegation that Stokesberry's real purpose was to search for evidence of crime, rather than to inventory the items on the motorcycle, Bray has argued that Stokesberry's inventory was incomplete, in that he did not list all the items found on the motorcycle. Stokesberry testified that he inventoried the motorcycle, including the contents of the saddlebags, because he had a duty to do so under the State Police policy that all impounded vehicles will be inventoried. He further testified that the purposes behind this policy were "to protect the property of the individual, and also to protect the wrecker service and the police officer so that we can document everything that is there so that nothing comes up missing and everything is protected as well as possible." While Stokesberry admitted on cross-examination that he did not list each and every item found during the inventory, he also explained that the purpose of his inventory was only to list "[t]hose items that [he] felt were of a vulnerable nature to be used by someone else or of value." According to Stokesberry's testimony, he did list those items which were valuable and vulnerable. Bray did not enter into evidence the inventory list produced by Stokesberry, nor did he show that Stokesberry failed to list items which were valuable and vulnerable. Thus, the record supports the district court's finding that the officers involved did not act in bad faith.

■ Absent a showing of bad faith by the police, our analysis, as stated in *Bertine,* centers upon the reasonableness of the inventory procedure performed by Stokesberry. In determining whether a particular inventory procedure is reasonable, we must balance the legitimate interests of the government in carrying out its administrative caretaking functions against the Fourth Amendment interests of the individual in the property subject to the inventory. *Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983).

The Supreme Court, in a number of cases, has recognized legitimate government interests in various administrative caretaking functions of police, which interests have been held to outweigh the individual's Fourth Amendment interests. In upholding an inventory search of a glove compartment in an abandoned automobile impounded by police, the Supreme Court in *Opperman* stated:

> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger. The practice has been viewed as essential to

respond to incidents of theft or vandalism.

*Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097. In *Opperman,* the Court recognized that "state courts, in applying the Fourth Amendment standard of reasonableness, have overwhelmingly concluded that, even if an inventory is characterized as a 'search,' the intrusion is constitutionally permissible." *Opperman,* 428 U.S. at 370–71, 96 S.Ct. at 3097–98. Citing numerous cases, the Court recognized that the majority of federal courts of appeal have likewise sustained inventory procedures as reasonable police intrusions. The Court further noted that:

> These cases have recognized that standard inventories often include an examination of the glove compartment, since it is a customary place for documents of ownership and registration, as well as a place for the temporary storage of valuables.

*Opperman,* 428 U.S. at 372, 96 S.Ct. at 3098 (citation omitted).

In *Lafayette,* the Supreme Court upheld a procedure pursuant to which the contents of the defendant's shoulder bag were inventoried at the time he was booked at the police station for disturbing the peace. During the inventory, amphetamine pills were discovered inside the plastic wrap of a cigarette package found in the shoulder bag. In upholding the inventory procedure, the Court balanced the intrusion on the individual's Fourth Amendment interests against the same governmental interests recognized in *Opperman:* the property owner's protection against theft, the protection of the police against false claims of stolen or damaged property, and protection of the police and others against potentially dangerous objects. The Court concluded, as in *Opperman,* that the legitimate governmental interests in inventorying the entire contents of the shoulder bag outweighed the defendant's privacy interests in the contents of the bag.

In *Bertine,* police officers discovered drugs while inventorying the defendant's van. The drugs were discovered when the officer opened metal containers found inside a closed nylon bag, which was found inside a closed backpack behind the driver's seat of the van. In upholding the inventory of the backpack and the containers found therein, the Court noted that "[k]nowledge of the precise nature of the property help[s] guard against claims of theft, vandalism, or negligence. Such knowledge also helps to avert any danger to police or others that may [be] posed by the property." *Bertine,* 479 U.S. 367, 373, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987).

In *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), the Supreme Court established additional criteria for determining whether an inventory procedure is unreasonable when the inventory search includes the opening of closed containers found within the impounded vehicle. In *Wells,* the defendant's car was impounded subsequent to his arrest for DUI. After the car was impounded, a highway patrol officer inventoried the contents of the car and found a locked suitcase in the trunk. When the officer forced the suitcase open, he found a bag containing a considerable amount of marijuana.

The Supreme Court held that the evidence seized in *Wells* was fruit of an unconstitutional search because the highway patrol department had failed to establish any policy with respect to opening closed containers encountered during inventory searches. The Court held that law enforcement agencies must institute either standardized criteria or an established routine to govern the opening of closed containers encountered during inventory searches. The Court further held that where law enforcement agencies have not established standardized criteria or routine practice regarding the opening of closed containers, an inventory which includes the opening of closed containers is unreasonable, being insufficiently regulated to satisfy the Fourth Amendment. The Court also noted, however, that nothing in its prior cases prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of

criminal activity. *Wells*, 495 U.S. at 3, 110 S.Ct. at 1634–35.

There are a number of facts in this case which lead us to the conclusion that the inventory of Bray's saddlebags was reasonable under the Fourth Amendment. We note, first, that the saddlebags were not locked, but were readily accessible to would-be thieves or vandals. This is significant in light of the fact that Stokesberry had been told by Bray that there was a .357 magnum revolver in one of the saddlebags. In *Cady v. Dombrowski*, 413 U.S. 433, 436, 93 S.Ct. 2523, 2525, 37 L.Ed.2d 706 (1973), the Supreme Court upheld the warrantless search of an automobile even though no probable cause existed to believe that the vehicle contained fruits of a crime. The Court held that the warrantless incursion was justified because the officers had reasonable grounds to believe that a weapon might be in the car, and thus available to vandals. The Court upheld the search as a reasonable exercise of the officers' caretaking function to protect the community's safety.

The governmental interests which justified the search in *Cady* are even more compelling in this case. In *Cady*, the police merely suspected that a gun would be found in the impounded vehicle, and the vehicle was a car that could have been locked. In this case, Stokesberry was informed by Bray that there was, in fact, a gun in one of the saddlebags, and the saddlebags were unlocked and on the outside of the motorcycle. Accordingly, we hold that Stokesberry's opening of the saddlebags to locate and secure the gun was justifiable pursuant to his community caretaking function as a police officer.

The unsecured condition of the saddlebags is also significant in light of the fact that saddlebags are "a customary place for documents of ownership and registration, as well as a place for the temporary storage of valuables." *Opperman*, 428 U.S. at 372, 96 S.Ct. at 3098. The same governmental interests which justified the inventory of the glove compartment in *Opperman* justify the inventory of the saddlebags in this case. Where the police are potentially responsible for property taken into their custody, it is reasonable for them to secure and protect the property from unauthorized interference. Inventories are a valid means of securing and protecting the impounded property. As recognized by the Supreme Court, in *Colorado v. Bertine, supra,* "[k]nowledge of the precise nature of the property help[s] guard against claims of theft, vandalism, or negligence. Such knowledge also help[s] to avert any danger to police or others that may have been posed by the property." 479 U.S. at 373, 107 S.Ct. at 742. Stokesberry could not know what property was inside the saddlebags without opening the bags and performing an inventory. Stokesberry's stated reason for performing the inventory was to list those items which were valuable and at the same time vulnerable to being damaged or stolen. We hold that Stokesberry's inventory of the saddlebags was reasonable in light of the legitimate governmental interest of protecting Bray's "property while it was in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372, 107 S.Ct. at 741.

Finally, Bray argues that the saddlebags should have been inventoried simply as "two saddlebags," and that Stokesberry's inventory of the saddlebags' contents exceeded the permissible scope of a valid inventory search under *Wells*. Bray asserts that the saddlebags were "closed containers," and that under *Wells*, Stokesberry was prohibited from opening and inventorying closed containers because the Idaho State Police, a division of the Department of Law Enforcement, had at the time no standardized criteria or established routine governing the opening of closed containers found while inventorying the contents of impounded vehicles.

Even if we were to decide, which we do not, that the Idaho State Police has failed to institute standardized criteria or an established routine to govern the opening of closed containers found during an inventory, we nevertheless uphold the inventory procedure conducted in this case. The saddlebags in this case are distinguishable

from the suitcase which was held to be a "closed container" in *Wells*. The suitcase in *Wells* was locked, and it was found inside the trunk of the impounded vehicle. The saddlebags in this case were not locked, and they were found attached to the exterior of the impounded vehicle. The measures required to reasonably secure the contents of the saddlebags were significantly different from the measures required to reasonably secure the contents of the suitcase. As discussed above, we believe that the saddlebags in this case are analogous to the glove compartment of the impounded vehicle in *Opperman*. In upholding the inventory of the glove compartment in *Opperman*, the Supreme Court did not analyze the glove compartment as a closed container, nor did it require the state to show that it had instituted standardized criteria or established routine with respect to the opening of glove compartments. The Court analyzed the inventory of the glove compartment in light of the characteristics of a glove compartment and the governmental interests which justify inventory procedures and concluded that the inventory was reasonable. Because we find the saddlebags in this case to be more analogous to the glove compartment in *Opperman* than the suitcase in *Wells*, we uphold the inventory of Bray's saddlebags under the same analysis employed in *Opperman*, and we will not employ the more stringent analysis which *Wells* applied to closed containers.

In any case, the Court in *Wells* stated that "[a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Wells*, 495 U.S. at 4, 110 S.Ct. at 1635. In light of the nature of the search and the characteristics of Bray's saddlebags, had Stokesberry not opened the saddlebags, but inventoried them as single units, the inventory procedure would not have served any of its legitimate purposes, i.e., protection of Bray's property, protection of the police and the wrecker from false claims of missing or damaged items, and protection of the police and others from dangerous instru- mentalities which might be found with the impounded vehicle.

## CONCLUSION

Having considered the purposes behind the inventory procedure and the characteristics of Bray's saddlebags, we conclude that Stokesberry's opening and inventorying of the saddlebags was a reasonable exercise of the administrative caretaking function of the police. Accordingly, we affirm the order denying Bray's motion to suppress.

WALTERS, C.J., and SILAK, J., concur.