858 P.2d 36 (1993)
The STATE of Nevada, Appellant,
v.
Stephen E. GREENWALD aka Stephen Shoeman, Respondent.
No. 21089.
Supreme Court of Nevada.
August 25, 1993.
Frankie Sue Del Papa, Atty. Gen., Carson City; Noel Waters, Dist. Atty., Allison W. Joffee, Deputy Dist. Atty., Carson City, for appellant.
Houston & Freeman, Reno, for respondent.

OPINION
SPRINGER, Justice:
The State appeals from the district court's granting of a motion to suppress illegally obtained evidence. The district court properly concluded that a violation of the Fourth Amendment could be found under the circumstances of this case.
*37 Motorcyclist Stephen E. Greenwald, in the company of other motorcyclists, was seen by a state trooper to pass another vehicle in a no-passing zone. The trooper followed Greenwald and observed further traffic law violations, prompting the officer to activate his siren and pull Greenwald over to the side of the road. The trooper advised Greenwald that he "needed to be arrested" and proceeded to handcuff Greenwald and placed him under arrest for reckless driving. The officer then searched Greenwald and, in the process, took Greenwald's wallet from his person and placed it on the ground. After doing this, the trooper locked Greenwald in a police vehicle. With Greenwald secured in the back seat of the police vehicle, the trooper returned to the place where the wallet lay, searched through its contents and counted the money contained in the wallet. Then the trooper proceeded to search the motorcycle. The trooper made a very careful and thorough inspection of the motorcycle, beginning at the front and going toward the rear until he had completed an exacting search of the entire vehicle.
It is hard to escape the conclusion that the trooper was searching for contraband when he went about examining the contents of the gas and oil tanks and even dismantling a flashlight, searching for the kinds of items the trooper thought might be secreted in a flashlight cylinder. The trooper searched the pockets of all clothing found on the motorcycle and made a complete internal inspection of the buckled saddlebags affixed to the motorcycle. The saddlebag search resulted in the trooper's finding of a firearm, a holster, an empty cartridge clip, and several "hits" of LSD. The trooper then prepared an inventory which included the firearm,[1] the holster, the cartridge clip, and the contraband LSD. These items were the only property listed on the trooper's inventory sheets. Although the trooper listed on his "Vehicle Report" (and not on the form entitled "Inventory/Receipt for Property") some other items of personal property (a jacket, goggles, helmet, gloves and a radar detector), he did not list or inventory on either form most of the items of personal property found during the search.
Quite obviously the officer in this case was not making a search incident to Greenwald's arrest, as the search was made some time after the arrest and at a time that Greenwald was well secured in a police vehicle. As the State points out in its opening brief, citing Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the authority to search incident to arrest derives from the need to disarm and prevent any evidence from being concealed or destroyed. With Greenwald safely locked away in a police car, there was no conceivable "need" to disarm him or prevent him from concealing or destroying evidence; so we leave this point.
The State claims in its opening brief, page 6, that "[t]he search of the motorcycle was [also justified as] a valid inventory search conducted pursuant to Florida v. Wells, [495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1] (1990)." The State quotes pertinent language in the Wells case which tells us that "an inventory search must not be a ruse for general rummaging in order to discover incriminating evidence." Wells, 495 U.S. at 4, 110 S.Ct. at 1635. Wells counsels further that the "policy or practice governing inventory searches should be designed to produce an inventory. The individual officer must not be allowed so much latitude that inventory searches are turned into `a purposeful and general means of discovering evidence of [a] crime.'" Id. at 4, 110 S.Ct. at 1635 (quoting Colorado v. Bertine, 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987) (Blackmun, J., concurring)). We agree.
After an evidentiary hearing, the district court made factual determinations adverse to the State's position in this case. Its findings are amply supported by the evidence. We have a search in which the officer did not even pretend to prepare a *38 complete inventory of all of the items that were the product of his extensive search of the motorcycle.[2] The contraband here was found only after a most intense and minute search of virtually every square inch of Greenwald's motorcycle and was found hidden in a zippered toiletry case in a black leather saddlebag closed securely with two buckles. It is rather obvious that the officer was not doing what he was doing just for the sake of taking inventory of Greenwald's "valuables." If he had not been searching for contraband, the officer would in all probability simply have inventoried "one zippered toiletry bag" and let it go at that. He would not, and did not, make a detailed inventory list of the toiletry items within the zippered bag, by making a list of such things as "one toothbrush," "five razor blades," and the like. In fact, the officer testified that when he does take inventory, he does not "write down the clothing or toiletry articles." If he was not going to inventory these articles (and he did not), why, one wonders, did he unzip the toiletry bag and search its contents? The answer appears to have been apparent to the district court judge in this case, who was justified in concluding that the officer was making an unwarranted search under the guise and "ruse" of an inventory search. See Wells, 495 U.S. at 4, 110 S.Ct. at 1635.
Perhaps the most supportive fact in justification of the district court's decision to suppress evidence produced by this search was the trooper's failure to produce an "inventory." As put by the Supreme Court in Wells, logically enough, "the policy or practice governing inventory searches should be designed to produce an inventory." Id. at 4, 110 S.Ct. at 1635 (emphasis added). Without an inventory, we can have no inventory search.
After reviewing the district court record, we agree with the judgment of the district court and conclude that the search was violative of the Fourth Amendment of the United States Constitution and of the Nevada Constitution, article I, section 18. The order of the district court is therefore affirmed.[3]
YOUNG and SHEARING, JJ., concur.
ROSE, Chief Justice, concurring:
I concur with the result only.
STEFFEN, Justice, dissenting:
In my view, the majority has unnecessarily deprived the State of the right to hold Greenwald accountable for the criminal possession of dangerous contraband (lysergic acid diethylamide, or "LSD"). As I read the law, there is ample latitude for constitutionally validating the search declared infirm by both the district court and a majority of this court. As the United States Supreme Court and other federal and state courts continue to redefine the amoeboid contours of the Fourth Amendment to meet the needs of a drug-infested society, I find today's majority opinion both counterproductive and legally undiscerning. I therefore dissent.
*39 Despite Greenwald's contention that he was unlawfully arrested, it is clear, and the majority do not conclude otherwise, that Greenwald's pre-arrest conduct justified his arrest.[1] After Nevada Highway Patrol Trooper Daniel Luke had arrested, handcuffed, searched, and secured Greenwald in his patrol car, the trooper commenced searching Greenwald's motorcycle in earnest. Unfortunately, the majority has rushed to the conclusion that the search was "[q]uite obviously" not made incident to the arrest because "the search was made some time after the arrest and at a time that Greenwald was well-secured in a police vehicle." The majority thus places an unwarranted gloss on both our federal and state constitutions to the effect that any time an officer properly arrests and secures an offender in a police vehicle, a subsequent search of the offender's vehicle may not be constitutionally countenanced on grounds that the search was incident to a lawful arrest.
The majority disposes of the issue of the search as a lawful procedure incident to Greenwald's arrest by merely citing Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), as authority for the proposition that the validating requisites for such a search are the need to disarm the arrestee and to prevent him or her from concealing or destroying evidence. The majority thus concludes that the issue is barren and undeserving of further analysis because Greenwald had been neutralized as a threat to persons or evidence at the scene.
Fortunately, constitutional rulings on the subject of search and seizure have, to a substantial extent, been adapted to the highly innovative methods of concealment and distribution developed by illicit drug merchants and addicts. The instant episode should be resolved in favor of the constitutional propriety of Officer Luke's search by virtue of the decision of New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).
Before analyzing Belton and other authorities supportive of the search that occurred here, it may be helpful to revisit the facts pertaining to the search performed by Officer Luke after Greenwald had been arrested and secured in the officer's vehicle.
Shortly after placing Greenwald in the patrol car and calling for a tow truck to remove the two motorcycles, Officer Luke commenced what he described as a standard inventory search for valuables and to protect the arrestee's property. The officer began his search at the front of the motorcycle and checked the clothing found there. He then looked under the speedometer and in the gas and oil tanks to determine whether they were in fact what they appeared to be or whether they may have been compartments in which valuables could be secreted. After checking under the driver's seat and the frame of the vehicle, Officer Luke then opened the saddlebags *40 that were hooked to the frame. The officer discovered that the bags contained a gun, clothing and a toiletry kit. Inside the kit among various toiletry items was a plastic baggy containing what appeared to be blotter acid (LSD).
According to the arrest report, when Officer Luke discovered the plastic baggy, he ceased the inventory, advised Greenwald of his Miranda rights, and inquired about the ownership of the LSD. Greenwald denied owning the substance and the female who had been riding on the motorcycle with him disavowed any knowledge of its existence. Officer Luke then arrested Greenwald and his female companion for possession of a controlled substance and thereafter completed inventorying the motorcycle. The tow truck arrived at the scene at approximately 1:30 p.m., which was about one hour from the time of Greenwald's arrest for reckless driving.
After a preliminary hearing, Greenwald was bound over for trial in the district court. Prior to trial, Greenwald moved the court for an order suppressing the LSD as the fruit of an unlawful search. In granting the motion to suppress, the district court found that the search was not incident to a lawful arrest because of the officer's testimony describing the search as an inventory performed to protect the valuables of the arrestee. Moreover, the district court determined that the search was infirm as an inventory search because no standardized criteria existed to guide the officer as required by Florida v. Wells, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). Finally, the court found that Officer Luke's search was performed for investigatory or exploratory purposes rather than an inventory purpose designed to protect Greenwald's property. Finding the district court's rulings unacceptable, the State appealed.
Both the lower court and this court's majority have described Officer Luke's search as a constitutionally prohibited ruse for an investigatory search. I would characterize the search as the socially desirable product of intelligent police work partially tarnished, but not invalidated, by an unduly complex, ill-defined and chameleonic body of law on the subject of search and seizure. In brief, far too often accountability for criminal behavior is sacrificed on the altar of a judicially created labyrinth of legal nuances upon which judges and lawyers joust. It is little wonder that even well-trained police officers with the best of intentions grope for talismanic phrases and explanations that will induce the judiciary to accept what reason and good common sense dictated they should do in attempting to enforce the laws of the land.
In the instant case, Officer Luke sensed and confirmed the commission of criminal conduct. When his efforts were challenged by Greenwald, the officer sought to validate his course of action under the somewhat tenuous rationale of an inventory search. We thus see the oft repeated spectacle of an officer who has successfully rooted out criminal behavior experiencing the frustration of becoming the focus of wrongdoinga threat to society and the constitution because of perceived procedural irregularities. Although judicial vigilance in maintaining the vitality of our Fourth Amendment rights is of undoubted importance, the judiciary has an equally strong obligation to avoid placing judicial barnacles on the amendment that have little bearing on the preservation of the rights conferred, and great bearing on the capacity of the law enforcement community to protect the quality of life in our society. To me, that is what this appeal is all about.

THE SEARCH INCIDENT TO THE LAWFUL ARREST
The majority's short shrift of Officer Luke's search as an acceptable incident to a lawful arrest reflects a myopic view of contemporaneity and expansiveness that is both moribund and unwarranted under current law. See Chimel, 395 U.S. at 763, 89 S.Ct. at 2040 (a lawful custodial arrest justifies the contemporaneous warrantless search of a person and of the immediately surrounding area). Fortunately, however, the instant case is controlled by Belton rather than Chimel since Greenwald was *41 the "occupant" of a vehicle prior to his arrest.
The arrest in Belton was occasioned by a New York State Trooper stopping the driver of a speeding vehicle. In the course of securing the driver's license and registration, the officer smelled the odor of burned marijuana and noticed an envelope on the floorboard marked "Supergold." Believing the envelope to contain marijuana, the officer ordered the occupants out of the car and placed them under arrest. After a pat search of the men, the officer secured them at different areas of the throughway and then proceeded to search the passenger compartment of the vehicle. The officer found a jacket on the back seat, unzipped one of the pockets and discovered cocaine. Belton was arrested for possession of a controlled substance.
Belton's unsuccessful motion to suppress the cocaine was overturned by the New York Court of Appeals which held (as the majority does here), that the search of the zippered pocket was not a valid search incident to arrest because "`there was no longer any danger that the arrestee or a confederate might gain access to the article.'" 453 U.S. at 456, 101 S.Ct. at 2862. The United States Supreme Court reversed holding that:
[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.
It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within the reach of the arrestee, so also will containers in it be within his reach. (Citations omitted.) Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have.
453 U.S. at 460-61, 101 S.Ct. at 2864 (footnotes omitted).[2]
Belton both clarified and expanded Chimel for the express purpose of establishing a workable rule for determining what constitutes the "area within the immediate control of the arrestee." The Belton Court thus defined that area to include the entire passenger compartment of a vehicle and any containers, whether open or closed, found therein. 453 U.S. at 460, 101 S.Ct. at 2864. I must conclude from both the spirit and the letter of Belton, that Officer Luke's search of the motorcycle's saddlebags and the containers found therein was constitutionally permissible. Moreover, the majority has cited no basis for its conclusion that the parallel provision in Nevada's Constitution should be interpreted any differently than the Fourth Amendment to the United States Constitution.
Other federal and state courts have also validated searches incident to a lawful arrest after the arrestee has been handcuffed and placed in a patrol car. See, e.g., United States v. White, 871 F.2d 41, 44 (6th Cir.1989) ("even after arrestee has been separated from his vehicle and is no longer within reach of the vehicle or its contents, the Belton rule ... applies, and such a search is valid"); United States v. Karlin, 852 F.2d 968 (7th Cir.1988), cert. denied, 489 U.S. 1021, 109 S.Ct. 1142, 103 L.Ed.2d 202 (1989) (search incident to arrest upheld where defendant was arrested, handcuffed, patted down and placed in squad car); United States v. McCrady, 774 F.2d 868 (8th Cir.1985) (search of locked glove compartment after defendant arrested and in patrol car upheld as search incident to arrest); United States v. Cotton, 751 F.2d 1146 (10th Cir.1985) (Belton does not require arresting officer to undergo a detailed analysis at the time of arrest of *42 whether the handcuffed arrestee could reach into the car to seize an item within it); United States v. Collins, 668 F.2d 819 (5th Cir.1982) (search after arrestee handcuffed upheld as search incident to arrest); see also State v. Wheaton, 121 Idaho 404, 825 P.2d 501 (1992) (search of car incident to arrest upheld where defendant had been arrested, handcuffed and placed in patrol car); State v. Haught, 122 Idaho 104, 831 P.2d 946 (Ct.App.1992) (a search made while the arrestee is at the place of arrest is incident to arrest "even though the arrestee is handcuffed and placed in the patrol car, with little or no chance of destroying evidence or obtaining a weapon"); State v. Fladebo, 113 Wash.2d 388, 779 P.2d 707 (1989) (during arrest process, even after suspect is arrested, handcuffed, and placed in patrol car, officers are permitted to search passenger compartment of vehicle for destructible evidence or weapons); People v. Boff, 766 P.2d 646 (Colo.1988) (search of motorcyclist's backpack at station after he was placed in custody upheld as incident to arrest); State v. Hensel, 417 N.W.2d 849 (N.D.1988) (search of vehicle conducted after defendant was arrested, handcuffed and placed in police car constitutional as search incident to lawful arrest).[3]
In summary on this point, the bright line rule established by Belton is perhaps best illuminated within the framework of the decision by the Seventh Circuit Court of Appeals in Karlin. The defendant in Karlin had sought to distinguish his situation from that in Belton by emphasizing that he had been arrested, handcuffed and placed in the patrol car prior to the search, whereas in Belton the arrestees had been made less secure and separated to positions in closer proximity to their vehicle. The Karlin court dispensed with Karlin's contention by stating:
If those differences in degree are to control, the Court's preference for a straight-forward rule for guidance of police officers and avoidance of hindsight determinations in litigation would be frustrated. It seems quite likely that, in instances where occupants of a car are arrested, they will be outside the car and will have been placed under some measure of security before the car is searched.
Karlin's contention would require a factual determination in each instance of how thoroughly the arrestee had been secured and his distance from the vehicle. It is significant that in Belton, the New York Court had determined, as Karlin proposes here, that by the time of the search there was no longer any danger that the arrestee or a confederate might gain access to the article.
852 F.2d at 970-71. I note that the facts in Karlin are squarely on point with the instant case, as Karlin had been removed from his vehicle, arrested, separated from his identification, pat searched, handcuffed, and secured in the patrol car prior to the search. The only added factor here, and I submit that it is of no significance, is that the officer had called the towing company to come for the motorcycles before commencing his search.
*43 The fact that Officer Luke, in a state of understandable confusion, sought to justify his search of Greenwald's motorcycle and attached containers as an inventory search is of no moment as far as the constitutional validity of the search is concerned. In Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Court concluded that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action." Id. at 138, 98 S.Ct. at 1723. Stated otherwise, "[i]n judging the legality of a search, courts must apply an objective standard and will not be bound by the subjective beliefs of the arresting officer." United States v. Jenkins, 496 F.2d 57, 72 (2d Cir.), cert. denied, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1974). Unfortunately, neither the district court nor the majority in the instant appeal has considered or recognized the eminently reasonable rule of objective analysis articulated in Scott and Jenkins.
Based upon the foregoing authorities and analysis, I submit that Officer Luke's search was constitutionally justified as a search incident to a lawful arrest, and that his attempt to validate or justify the search as an inventory search is of no determinative significance.

THE SEARCH AS AN INVENTORY SEARCH
Since Officer Luke performed a constitutionally valid search incident to a lawful arrest, I will refrain from engaging in an in-depth analysis of the propriety of his search as an inventory search. I would note, however, that under both federal and state case authorities, the issue is far from the "slam dunk" variety described by the majority. The district court denied validity to the "inventory search" on grounds that there were no standardized criteria within the Nevada Highway Patrol to guide Officer Luke and other highway patrol officers in conducting an inventory, and that in any event, the search was performed for exploratory or investigative purposes rather than to inventory and protect Greenwald's property. The majority on appeal only addresses and affirms the finding of the lower court on the latter point. I will therefore simply note as to the former, that both testimonial and documentary evidence reveals that the Nevada Highway Patrol did have standardized criteria for conducting inventory searches. The law on the subject of standardized criteria is addressed in substantial detail in Florida v. Wells, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1989) (police officers have degree of latitude in determining scope of inventory search where guided by standard criteria and the basis for the search is something other than suspicion of criminal activity).
The overriding theme underlying the majority's ruling in the instant case is that the extensive scope of Officer Luke's search reveals the inventory rationale as a ruse for an investigative rummaging for evidence of a crime. Although the issue of the validity of Officer Luke's search as a lawful inventory search presents a close question, there is a substantial body of law that, when applied to the facts before us, supplies a basis for sustaining the validity of the search. For example, the court in People v. Bray, 122 Idaho 375, 834 P.2d 892 (Ct.App.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993), held that motorcycle saddlebags are analogous to glove compartments and are subject to inventory searches. Moreover, the fact that Greenwald's saddlebags were unlocked and readily accessible to thieves or vandals supports the conclusion that an inventory of the saddlebags was reasonable. Bray, 834 P.2d at 898.
It hardly needs mentioning that items other than toiletries may be placed in toiletry bags. Indeed, Greenwald stored LSD in the toiletry bag and if another individual had gained access to it, there is no way of knowing what type of criminal or injurious behavior could have resulted from its ingestion.
In State v. Johnson, 745 P.2d 452 (Utah 1987), the Utah Supreme Court upheld an inventory search pursuant to a checklist *44 that included areas in the locked trunk and under the hood of the vehicle. Although Officer Luke did not perform a complete inventory, the majority is wrong in declaring that Luke failed to produce an inventory. The officer produced both a vehicle inventory (tires, cushions, battery, etc.) and an inventory of personal items (goggles, radar detector, cups, leather holster, etc.) despite the fact that neither was complete.
The foregoing provides at least skeletal ingredients for a cogent argument favoring the propriety of Officer Luke's efforts as an inventory search. It is, however, unnecessary to discuss further either the law or the facts pertaining to the subject of an inventory search as it relates to Greenwald's case since, in my view, the search was so clearly constitutional as an incident to Greenwald's lawful arrest. I nevertheless suggest that it is by no means certain under the existing case law that Officer Luke's search was unconstitutional even if it were scrutinized only from the perspective of an inventory search.
For the reasons discussed above, I am unable to join in the majority opinion and expressly dissent therefrom because I consider the ruling neither justified by the law nor responsive to the needs of an increasingly threatened society.
NOTES
[1] As far as we can tell from this record, there is no contention on the part of the State that the firearm was contraband or otherwise illegally possessed.
[2] We have no quarrel with the dissent's saying that the court is not bound by the arresting officer's characterization of the search as incident to arrest or as an inventory. If the officer had clearly been engaged in a search incident to arrest, no one would argue that his calling it an inventory search would, in itself, invalidate the search. The fact that the officer told the trial court that he was looking in the gas tank and in "every nook and cranny" of the motorcycle does have some bearing on the nature of the search. The trial judge concluded, on the basis of all the evidence before him, that the search was invalid under either guise. The dissent does not reveal how the trial judge erred in coming to this conclusion.
[3] Counsel in this case, David Houston, did not in the text of his Answering Brief (which he miscalls a "Reply Brief") give us one citation to the Record on Appeal. He did, however, in a footnote, state, "All citations shall be to the record on appeal and shall be denominated `ROA [Page Number]'." There are many references to the record and many quotations from the record in Mr. Houston's brief; yet not once does he refer us to the volume and page number of the Record on Appeal. Mr. Houston only makes reference to "Ph [page]" and "DM [page]" in four footnotes, and this type of reference is an incorrect format for reference to the Record on Appeal. NRAP 28(e). If Mr. Houston presents us with another brief of this quality, we will reject his brief and consider imposing sanctions. NRAP 28(a)(3) & (e).
[1] Prior to Greenwald's arrest, a Nevada Highway Patrol Trooper and a Nevada State Park Ranger observed two motorcycles passing vehicles in a posted no-passing zone on a heavily travelled, winding, two-lane road in the Lake Tahoe area. The two officers pursued the motorcycles in their separate vehicles. The trooper had difficulty overtaking the motorcycles as they were illegally passing southbound traffic and forcing northbound motorists off the road. Eventually the two motorcyclists responded to the trooper's siren and pulled over to the side of the road.

When the ranger arrived at the scene, the officers arrested Greenwald and the operator of the other motorcycle for reckless driving. Although Greenwald concedes that the trooper had reasonable cause for the stop and the issuance of a citation, he contends that the trooper unjustifiably placed him under custodial arrest as a pretext for an unlawful investigative search. The record nevertheless reveals that the trooper had a reasonable basis for arresting Greenwald after the latter had been driving in a manner that imperiled the lives of other motorists on the road. See NRS 484.377(1) (driving with willful or wanton disregard for the safety of persons or property constitutes crime of "reckless driving"); NRS 484.791(1)(f) (any peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that the person has committed the offense of reckless driving). The trooper explained that his decision to arrest was based upon his assessment of Greenwald's "driving behavior" and the judgment that Greenwald was "putting other peoples' lives in jeopardy...."
[2] The Court defined "containers" as "any object capable of holding another object [including] closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing and the like." 453 U.S. at 460-61, n. 4, 101 S.Ct. at 2864, n. 4.
[3] Although not cited by the majority in its rush to disavow Officer Luke's search as a valid procedure incident to a lawful arrest, the case of United States v. Vasey, 834 F.2d 782 (9th Cir. 1987), does provide some support for the majority's position, although both the vitality and the correctness of Vasey are seriously in doubt. Thus, in People v. Hunt, 225 Cal.App.3d 498, 275 Cal.Rptr. 367 (1990), the court observed that Vasey was distinguishable even assuming it was correctly decided.

The Vasey court invalidated a search incident to a lawful arrest that occurred at the scene thirty to forty-five minutes after Vasey had been arrested, handcuffed, and placed in the police vehicle. If Vasey remains good law within the Ninth Circuit today, it would clearly run counter to Belton and the vast majority of other courts, both federal and state. This is perhaps best confirmed by merely quoting from Hunt. "The federal Circuit Courts of Appeals have uniformly construed Belton's `bright line' rule to authorize contemporaneous searches of vehicles where the occupant(s) of the vehicles were immobilized and separated from the searched vehicles, usually by being put in the back of a patrol car." Hunt, 275 Cal.Rptr. at 372. In support of the premise, the Hunt court cited opinions from the 6th, 7th, 8th, and 10th circuits, together with state court decisions from New Hampshire, North Carolina, West Virginia, Delaware, Florida, Georgia, Tennessee, and Illinois.