**STATE of Delaware**

v.

**Vincent STALLINGS, Defendant.**

**Criminal Action Number IN–12–05–1255.**

Superior Court of Delaware, New Castle County.

Submitted: Nov. 22, 2012.
Decided: Dec. 24, 2012.

Andrew J. Vella, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for the State of Delaware.

Christopher D. Tease, Esquire, of Wilmington, Delaware, Attorney for the Defendant.

## OPINION

HERLIHY, Judge.

Defendant, Vincent Stallings, has moved to suppress a statement he gave to the Wilmington Police, and a gun seized from his residence. He contends the warrant for the search of his residence was illegal, as it was based primarily upon an earlier illegal inventory search of a vehicle, and that he was detained for an unreasonable time during which he gave a statement to the police.

The Court finds that the underlying inventory was properly conducted and the search warrant is valid. Further, there was no unreasonable delay in holding Stallings which, would rule his statement inadmissible. Accordingly, his motion to suppress is **DENIED**.

### Factual Background

The Wilmington Police had received complaints about drug dealing, indecent exposure, and loitering in a parking lot in the 800 block of W. Fifth Street. The lot is U-shaped between two apartment buildings.

Around 9:30 a.m. on April 26, 2012, Corporals Harold Bogeman and Donald Cramer drove by the parking lot. They observed a blue Taurus in the lot with two occupants. Cpl. Cramer approached the driver, Samuel Dawson, and Cpl. Bogeman went to the passenger, Quiniqua Lloyd. Cpl. Cramer asked Dawson for his driver's license and the vehicle registration. He had none and said he had borrowed the car that night from a "Vincent," whom he also knew as "Black." When speaking separately to the car's occupants there was a divergence in stories over their relationship. But they agreed Dawson had driven her there to drop her off. One of the officers checked the vehicle's registration and found it to be unregistered. He also learned Dawson's license had been suspended.

The police decided the car had to be towed, and this meant an inventory had to be taken. Cpl. Bogeman looked through some items in the backseat after the two occupants had been removed. One item he found was a scale. Cpl. Bogeman then moved to the trunk where he saw a Gucci bag; it was heavy and bulged in an odd way.[1] He opened the bag and found a fully loaded .45 semi-automatic gun. He also found gloves and baggies in a CD changer in the trunk. Cpl. Cramer gave Dawson his *Miranda*[2] rights. Dawson denied knowing of the gun in the trunk. At that time, Stallings arrived. Dawson indicated to the police that he recognized Stallings as "Black." Stallings ran up to the police saying, "That's my ride, what are you doing with my ride?"[3] Around 9:45 a.m.–9:50 a.m., the police detained or arrested Stallings. It is unclear to the Court what the police view of his status was at that point, arrested or detained.

---

1. The Court asked Cpl. Cramer, who was the only State's witness, to demonstrate with his hands how the bag appeared.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. He may have said "car" instead of "ride."

After Stallings was taken to the police headquarters, he was not then questioned. Back at police headquarters, the police further questioned Dawson. He told them that Stallings had a gun in his apartment, hidden in a couch. The police drove with Dawson to locate Stallings' residence, as he did not know Stallings' address. Somewhere between 11:45 a.m. and noon, the police learned that because of Stallings' record, he was prohibited from possessing a gun.

This led to Det. Conner obtaining a search warrant around 1:30 p.m. The pertinent portions of the affidavit state:

2. Your affiant can truly state that on 26 April 2012, at approximately 1000 hours, patrol officers responded to 801 W. 5th Street at the request of the property manager to address trespassing and loitering on the property. The officers observed two subjects seated in a 2004 Ford Focus. The occupants were contacted and separated and asked their reason for being there. The white male occupant stated that he did not know who owned the vehicle just that he was given the vehicle by a black male subject known as Black and that his first name was Vincent. The vehicle was unregistered and was to be towed. An inventory search was conducted on the vehicle and a handgun was located inside the trunk of the vehicle. The occupants were then taken into custody. The white male occupant, Samuel Dawson, stated that it was not his gun and that Black gave him the vehicle.

3. Your affiant can truly state that the officers were then approached by a black male who stated "what are you doing with my car". The white male

occupant of the Ford Focus stated that was Black and he is the one that gave me the car. The officers then took Vincent Stallings (4/19/91) into custody. The 2004 Ford Focus bearing DE registration 111928 which was driven up to the officers by Stallings was registered to a Lori Eldreth 1/11/93.

4. Your affiant can truly state that this writer interviewed Samuel Dawson 10/27/76, at central. He had advised the patrol officers that Vincent Stallings had another handgun inside of his apartment on Lancaster Avenue. This writer assisted by patrol officers transported Dawson to 8 Court Drive and Dawson advised that Stallings lived on the 3rd floor left apartment with his girlfriend named Lori. This writer then contacted the owner of that property and he advised that the occupant was Lori Eldreth and that was the only apartment(E) occupied on the third floor. This writer showed a photo of Lori Eldreth 1/11/93, to Dawson and he confirmed that was Vincent Stallings girlfriend. Dawson also advised that the handgun was in the couch in that apartment and that he saw it there yesterday.

5. Your affiant can truly state that Vincent Stallings was convicted of [a] felony on 1/14/2010, by the Superior Court State of Delaware. It should also be noted that Stallings has a door key that is a match for the 8 Court Drive, Wilmington, DE key supplied by the landlord.[4]

The search started at 2:00 p.m. and ended at 2:45 p.m. Once back at police headquarters, the police questioned Stallings starting around 3:10 p.m.–3:15 p.m. After

4. Affidavit of Probable Cause dated April 26, 2012.

he was given his *Miranda* rights, he waived them and provided a statement to the police.

### Parties' Contentions

Stallings seeks suppression of the gun and other items seized from his residence and the statement he made to the police. He claims that the search warrant was illegal, presumably based on the underlying inventory search of his car. Further, since he was detained for over six hours, that was an illegal detention—over two hours—his statement and the gun seized in his residence are the "fruits of the poisonous tree."[5]

The State contends the inventory search of the car was legal and lawfully led to the discovery of the evidence in it. It asserts the police had reasonable grounds to arrest Stallings at the scene and again once the gun was found in his house. In a supplemental post-hearing filing, the State has indicated that Stallings is charged as a person prohibited only for the weapon found in his residence not the gun found in the car. The State says Dawson has been indicted in connection with the weapon found in the Gucci bag in the trunk and the paraphernalia found in the car.

That clarification, the State contends, means the police search of the bag in the trunk is irrelevant to two of the three grounds Stallings raises, namely the propriety of the inventory search and the validity of the search warrant. The Court, therefore, need only address the detention issue.

### Discussion

The Court disagrees with the State's latest position for several reasons. First,

the inventory search forms a substantial basis for the affidavit of probable cause (see affidavit quoted above). Second, Dawson told the police, as the search warrant states and as Cpl. Cramer repeated at the suppression hearing, that the gun was not his. Third, the chain of events here cannot be so clearly parsed as the State contends or would like.

### A.

The analysis of Stallings' motion to suppress must start with issues underlying and underpinning the reasons for suppression that Stallings advances, and that is an issue this Court raised *sua sponte* at the suppression hearing, namely the property of the inventory search. At the hearing, the Court cited *State v. Gwinn*[6] which held inadmissible illegal drugs found inside a closed satchel in the trunk. The Supreme Court adopted as a general principle, the "automobile inventory" exception to the Fourth Amendment's search warrant requirement.[7] To conduct the inventory search, therefore, was lawful but it did not entitle the police to open a closed satchel found during that search.[8] In this case, the police opened the closed Gucci bag. Because *Gwinn* has not been expressly overruled despite later United States Supreme Court opinions, the Court believed and felt compelled bringing it to counsel's attention. Further, this Court has not addressed the conflict between *Gwinn* and subsequent cases, some being United States Supreme Court cases.

The first such case is *South Dakota v. Opperman.*[9] In that case, an illegally

5. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

6. 301 A.2d 291 (Del.1973).

7. 301 A.2d at 293.

8. *Id.* at 294.

9. 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

parked car was lawfully towed to the police impoundment lot.[10] There, an officer standing outside the car noticed valuables, such as a watch and other personal property in plain view.[11] The police unlocked the car.[12] A standard inventory search was then undertaken.[13] Inside, the officer opened the unlocked glove compartment and found illegal drugs.[14] They and the other items were removed from the car for safekeeping.[15] According to the Supreme Court, such police inventorying addresses three needs: (1) protection of the owner's property; (2) protection of the police from claims/dispute over lost or stolen property; and (3) protection needs of the police from potential danger.[16] The Supreme Court held that conducting the inventory was constitutionally reasonable being pursuant to standard police procedures.[17] What prompted the inventory was the watch and valuables police saw in plain view and the inventory was undertaken without hint of pretext.[18]

Remarkably, in *Gwinn*, the police found empty beer cans and saw the satchel in the car's interior during their otherwise lawful inventory search.[19] Despite the "plain view" of the beer cans and the closed satchel, that still did not enable the police to open a closed item.[20] But, notably,

there was nothing remarkable about the closed glove compartment itself in *Opperman* which, under *Gwinn*, may not have allowed the police to open it. The *Opperman* Court seems to have been persuaded of the efficacy of the inventory search because a watch was in plain view on the dashboard which the police could see while standing outside the vehicle.[21]

If there were any doubts about the role a plain view valuable providing legal basis for an inventory search, *Colorado v. Bertine*[22] seems to have removed them. Bertine was arrested for DUI.[23] Before a tow truck arrived, the police conducted an inventory search of his van.[24] The inventory search was conducted according to police procedures.[25] Inside the van, the police found and opened a closed backpack in which drugs and a large amount of cash were found.[26] The Supreme Court noted that there was no sign of bad faith or pretext, and the police were following accepted procedures for an inventory search.[27] The Supreme Court recognized, and reiterated, the three needs addressed by inventory searches, which were discussed in *Opperman*.[28]

The Supreme Court cited to *United*

10. *Id.* at 366, 96 S.Ct. 3092.

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.*

16. 428 U.S. at 369, 96 S.Ct. 3092.

17. *Id.* at 376, 96 S.Ct. 3092.

18. *Id.* at 375–76, 96 S.Ct. 3092.

19. 301 A.2d at 293.

20. *Id.* at 294.

21. 428 U.S. at 376, 96 S.Ct. 3092.

22. 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

23. *Id.* at 368, 107 S.Ct. 738.

24. *Id.* at 368–69, 107 S.Ct. 738.

25. *Id.* at 369, 107 S.Ct. 738.

26. *Id.*

27. 479 U.S. at 372, 107 S.Ct. 738.

28. *Id.* at 372, 107 S.Ct. 738.

*States v. Ross,*[29] which supported the reasonableness of inventory searches and other properly undertaken searches. The Court in *Ross* stated:

> When a legitimate search is under way, and when its purpose and its limits have been precisely define, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.[30]

There was a clarification of *Bertine* in *Florida v. Wells.*[31] A state trooper arrested Wells for DUI and searched his car trunk with Wells' permission.[32] A locked suitcase was found in it and forced open leading to the discovery of a large quantity of marijuana.[33] The Florida Highway Patrol had no policy regarding opening closed containers.[34] Recognizing that some discretion is needed in dealing with suspicious closed containers, the Court held, nevertheless, that absent any policy on opening closed containers, there was insufficient regulation of police discretion in that case.[35] The marijuana evidence should have been suppressed.[36]

This Court has confronted inventory search issues since *Gwinn.* One such case is *State v. Miller.*[37] In *Miller,* the police stopped a car for a traffic violation which had first been observed at a home that had been under surveillance in a drug investigation.[38] At the house, the police saw Miller carrying a small plastic bag to the car, but when the car was later stopped, the police could not see the bag.[39] The car was impounded and an inventory search began at the scene.[40] The police used the car keys to unlock the glove compartment where the plastic bag was found, which contained drugs.[41]

This Court referred to *Gwinn* and noted it was decided before *South Dakota v. Opperman.*[42] This Court said *Gwinn* was focused on opening the trunk, not on luggage in the trunk.[43] However, this Court said the police should not be allowed to search glove compartments trunks or other containers in vehicles "without some particular reason for doing so."[44] The evidence seized was suppressed.[45]

The Supreme Court of Delaware in *Lively v. State*[46] upheld seizure of a gun found under a floor mat during an inventory search of a car which was probably stolen. The Court approved the inventory

**29.** 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)

**30.** *United States v. Ross,* 456 U.S. 798, 821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**31.** 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

**32.** *Id.* at 2, 110 S.Ct. 1632.

**33.** *Id.*

**34.** *Id.* at 3, 110 S.Ct. 1632.

**35.** *Id.* at 5, 110 S.Ct. 1632.

**36.** *Id.* at 4–5, 110 S.Ct. 1632.

**37.** 420 A.2d 181 (Del.Super.1980).

**38.** *Id.* at 182.

**39.** *Id.*

**40.** *Id.*

**41.** *Id.*

**42.** *Miller,* 420 A.2d at 183.

**43.** *Id.*

**44.** 420 A.2d at 184.

**45.** *Id.*

**46.** 427 A.2d 882 (Del.1981).

search in a store parking lot, and the Court noted the inventory was conducted according to standard police procedures.[47] It is to be noted that there was no container, glove compartment or other closed and/or locked item which had to be opened to be searched.[48] Some part of the gun was exposed (which part not specified) after the officer was inside the car prompting him to lift up the floor mat.[49] *Gwinn* was only cited as generally approving proper inventory searches as not violative of the United State Constitution and for approving it as an exception to the Fourth Amendment search warrant requirement.[50]

This Court in *State v. Deputy*[51] upheld an inventory search of a car used by two persons to get to Macy's where they shoplifted. The inventory was conducted in the parking lot and in the door handle, the police found cocaine.[52] The police testified that the inventory was performed according to well established police procedures.[53] Those procedures, the police witness said, include that when a shoplifter is arrested, the arresting or investigating officer conduct an inventory search and have the car towed.[54] Based on this policy, the testifying arresting officer also said the drugs would have been inevitably found.[55] The

Court noted there was no suggestion of bad faith or that the police were following standardized procedures.[56] No bag or container was opened in the *Deputy* case.[57] That meant *Gwinn* did not have to be addressed.

In *State v. Brownell,*[58] this Court suppressed evidence seized from a film canister while the officer was looking for pedigree information at an accident scene.[59] The officer's testimony was only that he followed police inventory policies, but the otherwise offered no specifics about the policy.[60] This Court questioned whether pedigree information would be found in a small film canister.[61]

Finally, in *State v. King,*[62] this Court upheld the recovery of three empty beer cans in a closed cooler behind the driver's seat. The defendant's car was in an accident, was inoperable, was partially blocking traffic, and needed to be towed.[63] The inventory was at the scene.[64] The officer conducted the inventory according to State Police policy for the protection of the tow company and of the defendant by making a list valuables.[65] The Court referred to *Deputy* as upholding the police ability to open closed containers (there was no

47. *Id.* at 883.

48. *Id.*

49. *Id.*

50. 427 A.2d at 883.

51. 2001 WL 1729120 (Del.Super. Dec. 20, 2001).

52. *Id.* at *1.

53. *Id.* at *2.

54. *Id.*

55. *Id.*

56. *Id* at *3

57. *Id.* at *1.

58. 2005 WL 268043 (Del.Super. Jan. 28, 2005).

59. *Id.* at *1.

60. *Id.*

61. *Id.* at *2.

62. 2007 WL 1153058 (Del.Super. April 3, 2007).

63. *Id.* at *1.

64. *Id.*

65. *Id.*

closed container in *Deputy* ). *Gwinn* was not addressed.[66]

All of this discussion has several purposes. First, it is clear that the law regarding inventory searches has changed since *Gwinn*. Based on *Opperman* and *Bertine*, *Gwinn's* ban on opening closed containers during a properly undertaken inventory search of a vehicle is no longer the law of the land. Since *Gwinn* was decided in 1973 on Fourth Amendment grounds only, and the United States Supreme Court has subsequently opined otherwise about closed containers, *Gwinn's* restrictions regarding closed containers is no longer applicable. This Court, as a lower court cannot, however, override the Delaware Supreme Court. That Court will have to do it, though it appears it has not yet been given the opportunity to re-evaluate *Gwinn's* efficacy in the light of later decisions.

A second reason for the Court's extensive discussion is that Superior Court itself has not squarely addressed, up until now, *Gwinn's* holding in light of those subsequent United States Supreme Court decisions. To the extent this lower Court can, this opinion has sought to do so. Again, it will be up to the Delaware Supreme Court to address this issue.

The third reason, of course, relates directly to the motion to suppress and that is the validity of the inventory search in this case. It involves several aspects: (1) did the circumstances warrant the police impounding the vehicle and having it towed and an inventory conducted; (2) was the inventory conducted according to established police procedures; and (3) was the seizure of the gun from the closed Gucci bag lawful? From the answers to these questions, the answer to the validity of the search warrant, Stallings' detention and his statement flow.

■ The inventory and seizure of the gun in the Gucci bag were done without a warrant. On a motion to suppress that challenges a warrantless search, the State has the burden of proving that the inventory search here was conducted consistent with the Fourth Amendment.[67]

■ There are a number of factors validating the police action here. First, based on the complaints about illegal activities in the parking lot, the police had the right to seek preliminary information from the car's occupants and about the car they were in. Obtaining that information did not take long, a matter of a few minutes. Second, they learned Dawson was not the car's owner and had a suspended driver's license. Third, the car was unregistered. Fourth, the vehicle was in a private parking lot where complaints had been made of drug activity and other illegal activity.

The decision was made to conduct the inventory before Stallings arrived. Even if he had arrived before that decision was made or before the inventory had started, the car was unregistered. Thus, there would be an issue of whether the police would have allowed him to drive it away, despite his references to "his car."

The Wilmington Police have a written policy covering, among other things, the various circumstances allowing for towing cars and what is to be done with them. The policy has been in effect since 1993 and is part of the record in this case.[68] The testimony from Cpl. Cramer that the Wilmington Police Department Policy was

**66.** *Id.* at *4.

**67.** *Hunter v. State,* 783 A.2d 558, 560 (Del. 2001).

**68.** State's Ex. 1.

followed is confirmed by pertinent portions of that policy.

■ Among other reasons in the policy, towing a vehicle is permitted when the operator is arrested.[69] The police certainly had probable cause to arrest Dawson for driving without a license and/or operating an unregistered motor vehicle. He could not drive it. The passenger, who was not the owner, could not drive it and under the circumstances of a private lot, etc., it was appropriate to have it towed. Stallings points out correctly that, the City Policy states a vehicle will not be towed if the only offense is for driving an unregistered vehicle.[70] But, as the record shows, there was much more here than that to justify the decision to impound and tow. Once that decision was made, the inventory became necessary.

The City Police policy gave the police discretion to conduct the inventory at the scene, the police station, or the tow yard.[71] That discretion to perform the inventory at the scene was properly exercised here. There really is no issue about where the inventory occurred. Even if the car had been towed and an inventory search done then, the gun would have been discovered.

The City Police policy has other applicable provisions:

A. Purpose

The purpose of this section is to establish a uniform set of guidelines for conducting inventories of motor vehicles that are taken into custody by the Department of Police. The purpose of the inventory is to protect the lawful owner's property and to avoid claims of theft of damage against the seizing officer. Specifically the guidelines are intended to:

1. Protect the property of others while in police custody.
2. Protect the members of the Department of Police against claims or disputes over lost or stolen property.
3. Protect the members of the department from potential danger.
4. Respond to incidents of theft or vandalism.

\*   \*   \*

Recent Court decisions have allowed evidence of a crime to be used when discovered during the course of an inventory of a legally impounded vehicle when a policy for inventory exists. However, officers should be aware that when the inventory is found to have been conducted for the purpose of evidence in illegal search will have occurred.[72]

The inventory is to be thorough.[73] The policy directs that glove compartments, trunks, and containers whether opened or closed should be inventoried for valuables as part of the inventory of the entire vehicle.[74]

In short, there is a long-standing Wilmington Police policy authorizing towing vehicles whether illegally parked, abandoned, seized as evidence or for other reasons and a clear cut set of procedures for conducting an inventory. The police followed those procedures here in all respects. Further, when the Gucci bag was lifted up it had an odd shape and was strangely unbalanced.[75]

---

69. State's Supp. Brief, Ex. A, p. 4.

70. Id. at 4.

71. Id. at 9.

72. Id. at 8.

73. Id. at 9.

74. Id.

75. In Gwinn, the Supreme Court noted there was "nothing unusual or suspicious about the satchel." 301 A.2d at 293. In Opperman and

■ In the most respectful way it can, this Court cannot follow *Gwinn's* holding about opening a closed container. Subsequent United States Supreme Court decisions and even some decisions of this Court show why. The police had proper grounds to conduct the inventory and to open the Gucci bag. There is no suggestion at all here of a pretext to conduct the inventory.

## B.

■ Stallings challenged the search warrant for his house which the police obtained to search for the gun Dawson said was there. The challenge was premised on the illegality of the inventory search, cited in the affidavit of probable cause, which the Court has now found to have been constitutionally conducted. Since paragraph two of the affidavit [76] incorporated narrative about that inventory, the rest of the affidavit has more than ample probable cause to support the issuance of the warrant. The State contends this Court did not need to address either the propriety of the inventory search or the validity of the search warrant which rested in large part on the inventory. The Court, as noted, and as this opinion demonstrates, disagrees. The search warrant is valid.

*Bertine*, there was no indication that the Supreme Court's approval opening closed containers were in any way dependent on there being something "remarkable" or "suspicious" about the container or glove compartment.

76. Your affiant can truly state that on 26 April 2012, at approximately 1000 hours, patrol officers responded to 801 W. 5th Street at the request of the property manager to address trespassing and loitering on the property. The officers observed two subjects seated in a 2004 Ford Focus. The occupants were contacted and separated and asked their reason for being there. The white male occupant stated that he did not know who owned the

## C.

This analysis then turns to the one issue both parties contend is an issue, namely the length of Stallings' detention prior to him giving a statement. One matter must be stated up front. Stallings has not challenged his statement on the basis the police violated his *Miranda* rights in taking it. His challenges are two fold (1) that the statement is the "fruit of the poisonous tree" [77] and (2) that the police detained him unreasonably before taking his statement.

His first challenge is premised on the inventory being improper and that the circumstances of it became part of the affidavit of probable cause for the warrant to search his residence. Since the Court has held against him on that first challenge, the analysis turns to the length of and circumstances of his pre-statement detention.

Stallings was taken into custody in the parking lot around 9:45 a.m.–9:50 a.m. The police questioning began around 3:10 p.m.–3:45 p.m. Though the police may have used the word "detained," that labeling does not prevent this Court from analyzing the circumstances as an arrest.[78] It is not clear, however, that when the police took Stallings into custody, they did so under the

vehicle just that he was given the vehicle by a black male subject known as Black and that his first name was Vincent. The vehicle was unregistered and was to be towed. An inventory search was conducted on the vehicle and a handgun was located inside the trunk of the vehicle. The occupants were then taken into custody. The white male occupant, Samuel Dawson, stated that it was not his gun and that Black gave him the vehicle.

77. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

78. *State v. Bowden*, 273 A.2d 481, 483 (Del. 1971).

two hour detention law.[79]

██ Stallings' own spontaneous utterances at the scene that the car was his, coupled with the discovery of drugs and a gun in the car, clearly gave the police probable cause to arrest him for several offenses when they took him into custody at 9:45 a.m.–9:50 a.m. There was, therefore, no violation of the statutory two-hour detention provisions. Within five and a half hours of his being taken into custody, the questioning began. In the interim, the police spoke to Dawson, located Stallings' residence with Dawson's assistance, applied for and obtained, a search warrant for Stallings' residence, and executed it. Their actions were prompt. The leads uncovered and follow-up actions were not only good police work but were done diligently. There was no unlawful detention prior to Stallings' questioning. The statement is admissible.

### Conclusion

For the reasons stated herein, Vincent Stallings' motion to suppress is **DENIED.**

**IT IS SO ORDERED.**

---

79. 11 *Del. C.* § 1902.