**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                      No. 94-5901

ANTHONY D. HAWKS,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CR-94-206-S)

Argued: July 14, 1995

Decided: January 17, 1996

Before NIEMEYER, HAMILTON and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion
of the court except on part IV, in which Judge Hamilton and Judge
Michael join. Judge Michael wrote the opinion of the court on part
IV, in which Judge Hamilton joins and from which Judge Niemeyer
dissents.

_____

**COUNSEL**

**ARGUED:** Robert Charles Bonsib, MARCUS & BONSIB, Green-
belt, Maryland, for Appellant. Jamie M. Bennett, Assistant United
States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:**
Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for
Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

NIEMEYER, Circuit Judge, writing the opinion of the court except on part IV; part IV is a dissenting opinion:

Anthony Hawks was convicted of violating drug and firearms laws based on evidence obtained during police surveillance and seized during searches of his residence and his automobile. He was sentenced as an armed career offender to 322 months imprisonment. On appeal, Hawks contends that (1) the warrant to search his residence in January 1994 was not supported by probable cause; (2) the warrantless search on the same day of his Nissan Pathfinder was illegal; (3) his consent to search his residence a second time in May 1994 was obtained through improperly coercive tactics; and (4) his sentence was calculated improperly because he is not an armed career offender. Finding his arguments unpersuasive, we affirm.

I

In December 1993, the Baltimore City Police began to investigate Hawks' activities after receiving information from a confidential informant. The informant told the police that Hawks was delivering drugs to street dealers at the corner of Abington and West Baltimore Streets between 9:30 and 10:00 every morning and that Hawks stored drugs in his residence at 2712 West Baltimore Street. The police knew the area surrounding Abington and West Baltimore to be an "open air drug market where cocaine and heroin[could] be purchased seven days a week." The police also knew that Hawks had previously been convicted for handgun and drug violations.

Based on this information, the police maintained surveillance of Hawks' residence, beginning in late December 1993. On two occasions, they observed Hawks leave 2712 West Baltimore Street early in the morning and drive his black Nissan Pathfinder to the corner of Abington and West Baltimore Streets, as the informant had described.

2

Each time, the officers observed Hawks remove a brown paper bag from his car and hand it to an unidentified person whom the officers identified as "Johnny." While the officers never saw the contents of the brown paper bag, they observed "Johnny" retreat into a nearby alley and reappear several times to conduct transactions which the police believed to be drug transactions. The officers also recovered drugs from the alley to which this unidentified person returned after each sale.

Based on the results of this surveillance, the police obtained a warrant in January 1994 to search Hawks' residence. Before executing the warrant, the officers waited outside Hawks' residence to see if he would make his daily journey so that they could make a "felony stop." At about 9:30 a.m., Hawks stepped outside of his house but quickly retreated when he noticed the officers. At that point, the officers executed the warrant, entering Hawks' house by force. Once inside, the officers found Hawks flushing baggies of crack down the toilet, but they were able to recover four baggies of crack. The officers placed Hawks under arrest and searched the house. They seized drug paraphernalia, over $15,000 in cash, and two loaded guns. The officers also seized the Nissan Pathfinder and two other automobiles owned by Hawks and his wife, pursuant to Baltimore Police Department regulations governing forfeiture of property suspected in connection with a drug felony. Before towing the vehicles, the officers conducted an inventory of the vehicles' contents and found four baggies of crack in the Nissan Pathfinder.

After his arrest and release by state authorities, Hawks was indicted by a federal grand jury on drug charges on May 27, 1994, and a bench warrant was issued for his arrest. The following day, Hawks was arrested outside of his home. While he was being transported in a police vehicle, ATF Special Agent James Tanda radioed and asked that Hawks be returned to his house so that his consent could be obtained to search his residence. At that time, the police did not have probable cause to obtain a search warrant.

Once back at 2712 West Baltimore Street, Agent Tanda again read Hawks his Miranda warnings and then asked him to sign a consent-to-search form. There is conflicting testimony over what happened next. According to Hawks' testimony, Hawks initially refused to give

3

his consent to search his home, but instead requested permission to go inside his house, unaccompanied, to see his young child who was asleep. The child, four years old, supposedly had been in the house alone for several hours. According to Hawks, Agent Tanda refused to let Hawks see his son unless Hawks signed the consent-to-search form. Hawks also testified that his twenty-year-old niece was available to check on the child, but that the police would not let anyone into the house unless Hawks signed. Hawks ultimately agreed to sign the consent form because he was concerned about his son. Hawks also consented to a search of his Nissan Pathfinder and one other automobile.

As a result of this search of Hawks' residence and automobiles, the officers recovered over $17,000 in cash, a gun cleaning kit, ammunition of various calibers, and a scale with white powder residue. After the search was completed, Hawks was taken to the ATF office where once again he was read his Miranda rights. He signed a written waiver of his rights and then made various self-incriminating statements to Agent Tanda which were used at his trial.

Prior to trial, the district court held a suppression hearing on Hawks' motion to suppress the fruits of (1) the January 1994 search of his house; (2) the search of his Nissan on the same day; and (3) the May 1994 search of his residence and two cars. After the district court denied the motions, Hawks was convicted by a jury. The court sentenced Hawks to a total term of imprisonment of 322 months, which included a mandatory enhancement under the Armed Career Criminal Act, 18 U.S.C. § 924(e).

II

Hawks first challenges the sufficiency of the affidavit offered by the police to support their application for a warrant to search Hawks' residence in January 1994. He asserts that the affidavit did not demonstrate probable cause to search the house.

Based on our review of the application for the warrant, we conclude that the magistrate judge was provided with probable cause to believe that contraband or evidence of criminal activity would be found in Hawks' residence.

4

First, the tip of the confidential informant, who told the police of Hawks' daily excursions to the open air drug market, was corroborated by the surveillance team, which observed Hawks on two early morning trips, behaving exactly as the informant predicted. See United States v. Miller, 925 F.2d 695, 698 (4th Cir.) (holding that reliability of informant may be established through corroborating information), cert. denied, 502 U.S. 833 (1991). Second, the affidavit included information, supplied by the informant, specifically linking the location to be searched to the possibility of finding contraband, i.e. the affidavit reports that the informant told police that Hawks stored drugs in his house. See United States v. Lalor, 996 F.2d 1578, 1583 (4th Cir.), cert. denied, 114 S. Ct. 485 (1993) (finding that affidavit failed the "nexus" requirement).

Finally, we reject appellant's contention that the affidavit was insufficient because the surveillance team could only observe transactions involving brown paper bags, but could not know for sure whether any of the bags actually contained drugs. The police knew that area surrounding Abington and West Baltimore Streets was "an open air drug market." On two mornings at around the same hour, the police observed Hawks drive up to that intersection in his black Nissan Pathfinder, exit his vehicle, wait for a man identified as "Johnny" to approach him, remove a brown paper bag from his vehicle, hand that bag to "Johnny," and then drive off. The police then observed "Johnny" walk into a nearby alley and return to the corner a few minutes later. During the next hour, the police saw "Johnny" repeatedly receive currency from various passersby while another unidentified man would hand the buyer a small object. These circumstances provide ample evidence for the police, drawing upon their experience and common sense, to surmise that they were observing drug transactions even if they could not get close enough to identify the actual objects being exchanged. Accordingly, we conclude that probable cause supported the application for a search warrant.

III

Hawks next challenges the constitutionality of the January 1994 warrantless search of his Nissan Pathfinder. While the government acknowledges that the police possessed insufficient information to justify a search of the vehicle for incriminating evidence, it notes that

5

the police seized the Nissan with the intent of forfeiting it under state law. Following established police regulations, the officers conducted an inventory search of the seized Nissan.

It has long been settled that the government may conduct a warrantless, routine "inventory" search pursuant to standardized police procedures without violating the Fourth Amendment. See South Dakota v. Opperman, 428 U.S. 364 (1976); Florida v. Wells, 495 U.S. 1 (1990); United States v. Brown, 787 F.2d 929 (4th Cir.), cert. denied, 479 U.S. 837 (1986). For an inventory search of a vehicle to be valid, (1) the vehicle must be in the lawful custody of the police; (2) the inventory search must be routine and conducted pursuant to standard police procedures; and (3) the purpose of the inventory search must be to secure the car or its contents and not to gather incriminating evidence. See Brown, 787 F.2d at 932.

The Baltimore City Police regulations on vehicle forfeiture are intended to implement § 297, Article 27, of the Maryland Code which directs the seizure of vehicles that are "used, or intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances]." These regulations require the seizure of a vehicle when (A) controlled substances are sold from that vehicle; or (B) controlled substances are found in the vehicle in an amount reasonably indicating that sale is contemplated; or (C) the total circumstances of the case dictate that seizure is justified. Baltimore City Police Dep't, Gen. Order 3-84, § I(A)-(C) (Feb. 1, 1984). The regulations go on to state:

> Officers shall inventory all personal and detachable property not removed from the vehicle by the owner prior to being transported to the storage facility. . . . All inventoried property shall be processed according to established departmental procedures.

Id. at II(A).

On appeal, Hawks contends, first, that the seizure of the vehicles was not justified under the Baltimore City Police regulations, and second, that even if the seizure was justified, the need to inventory the contents of the vehicles was merely a pretext for conducting an illegal

6

warrantless search for evidence. Hawks does not challenge the legitimacy or constitutionality of the Baltimore City Police regulations.

Hawks' first contention is without merit, as the "total circumstances of the case" dictated that the police seize Hawks' Nissan Pathfinder for possible forfeiture. See Gen. Order 3-84, § I(C). Indeed, approximately one week before Hawks was arrested, the police had observed Hawks using the Nissan Pathfinder on two occasions to distribute what the police reasonably understood to be controlled substances. These observations, coupled with the "circumstances of [Hawks'] arrest"--i.e. Hawks' hurrying back into his house to attempt to flush baggies of crack down the toilet--justified the seizure of the Nissan Pathfinder. There would be less grounds for seizing the other two vehicles owned by Hawks and his wife because the police did not actually observe those vehicles being used in suspected drug transactions. But Hawks challenges only the seizure of the Nissan, the only car in which incriminating evidence was found. When this case was pursued in federal court, all three cars were returned to their owners.

Once the seizure of the vehicles was justified, the unchallenged police regulations require that the officers enter the passenger sections of the vehicle to inventory the contents. Accordingly, the inventory search of the Pathfinder was constitutional.

IV

Hawks also contends that he was coerced into consenting to a second search of his residence when he was arrested by federal authorities on May 27, 1994. Hawks claims that after officers arrested him outside of his house and started driving him downtown, Hawks turned to one of the officers and asked them if he could return to his house to see his four-year-old son:

> I said to the officer, I said, my four-year-old son is in the house upstairs by himself, asleep. I said, when he wakes up, he is going to be startled because nobody is in the house with him . . . . [The officer] said we'll go back if we can search your house.

Although Hawks had not yet agreed to authorize a search, the officers took Hawks back to his house. Hawks does not deny that once back at his house, the officers re-read him his <u>Miranda</u> rights, explained that he was not required to give his consent, and informed him that he could force the officers to obtain a search warrant first. The officers told Hawks that no one would be allowed to enter the house to check on his son unless he signed the form. Hawks concedes that he eventually did give his consent, but only because he believed that it was the only way that he could check on his son.

ATF Special Agent Tanda, the officer supervising the arrest, contradicted key aspects of Hawks' testimony. Most importantly, Agent Tanda testified that when he was arrested, Hawks was not wearing a shirt and that Tanda allowed Hawks to enter his house, unaccompanied and without handcuffs, to change clothes and take care of his son. Agent Tanda further testified that Hawks was taken back to his residence not at the request of Hawks, but at Tanda's request, because Tanda wanted to try to convince Hawks to give his consent. Agent Tanda denied that any further discussion about Hawks' son took place, or that the officers told Hawks that no one else could enter the house.

Rather than choose between these conflicting versions of events, the district court assumed <u>arguendo</u> that Hawks' story was accurate, but concluded nevertheless that Hawks' decision was "voluntary" for purposes of Fourth Amendment analysis.

According to Hawks, he asked to be taken to his house to see his son. While the police were under no obligation to grant Hawks' request, they offered Hawks a "bargain": he could see his son if he agreed to let the police search his house. Hawks was free to reject this offer, in which case he would be in exactly the same position as he was before he made the request. While I see little difference in the decision facing Hawks and the decision which defendants face regularly when offered a plea bargain--they must choose whether to plead guilty and forsake their constitutional right to a trial in return for a benefit--if improper coercion produced Hawks' agreement, the taint was harmless. In light of the strong evidence otherwise obtained, I conclude the jury would have convicted Hawks nevertheless.

8

In sum, even if I assume arguendo that Hawks' testimony is true, I question whether the search was the product of a coercive offer and conclude in any event that any error was harmless.

V

Finally, Hawks asserts that it was error for the district court, in calculating his sentence, to consider his prior conviction for attempted burglary as a "crime of violence" for purposes of sentencing him under the Armed Career Criminal Act, 18 U.S.C. § 924(e). We have recently decided, however, that attempted burglary is a "crime of violence" that may trigger sentence enhancement under 18 U.S.C. § 924(e). See United States v. Custis, 988 F.2d 1355, 1363 (4th Cir. 1993), aff'd on other grounds, 114 S. Ct. 1732 (1994).

VI

For the reasons given in parts I, II, III, and V, above and in part IV written by Judge Michael, we affirm Hawks' conviction and sentence.

AFFIRMED

MICHAEL, Circuit Judge, writing the opinion of the court on Part IV, in which Judge Hamilton joins:

IV.

Hawks also contends that he was coerced into consenting to a second search of his house when he was arrested by federal authorities on May 27, 1994. This claim cannot support a reversal of Hawks' conviction.

According to Hawks, after officers arrested him in front of his house and started driving him to ATF offices downtown, Hawks told them he was concerned about his four-year-old son, who had been left alone in the house. Hawks testified as follows at the suppression hearing:

9

> I said to the officer, I said, my four-year-old son is in the house upstairs by himself, asleep. I said, when he wakes up, he is going to be startled because nobody is in the house with him, right. He [the officer] said we'll go back if we can search your house. I said all I want to do is wait until my niece comes back. She is at the store. So, he said, can we search your house.

Hawks did not then agree to a search, but the officers took him back to his house. Hawks testified that when they arrived, Hawks' niece, who was waiting outside, told him that officers would not let her into the house to check on the boy until Hawks first consented to a search. The officers then re-read Hawks his <u>Miranda</u> rights and told him he was not required to give consent. Hawks said the officers also told him no one would be allowed to enter the house to check on his son unless he signed the consent form. According to Hawks, he signed the form because of concern for his son.

ATF Special Agent Tanda, the officer supervising the arrest, contradicted some of Hawks' testimony. According to Tanda, Hawks was not wearing a shirt when he was arrested, and Tanda let Hawks go inside the house to change clothes. According to Agent Tanda, he decided to have Hawks returned to the house so that the officers could try to get Hawks' consent for a search. Agent Tanda said that Hawks never asked to be returned home and that he (Tanda) never heard Hawks express any concern about his young son.

The district court concluded that, even if it accepted Hawks' testimony as true, Hawks was simply presented with a difficult choice and was not coerced. The suppression motion was denied and the fruits of the May 27, 1994, search, including $17,000 in cash and a scale with white powder residue, were admitted into evidence.

We need not reach the question whether coercion produced Hawks' agreement to the search of his house on May 27, 1994. Assuming <u>arguendo</u> both that Hawks' testimony is true and that it was error for the district court to admit evidence of the May 27 search, we are convinced that any error was harmless beyond a reasonable doubt. In light of the other strong evidence against Hawks, including the crack, cash, drug paraphernalia, and guns seized during the first search of his

10

house in January 1994, we conclude the jury would have convicted him nevertheless.

11