**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**February 3, 2025**

# In the Court of Appeals of Georgia

A24A1469. HUERTAS v. THE STATE.

BROWN, Judge.

In this interlocutory appeal, Daniel Huertas appeals from the trial court's denial of his motion to suppress evidence obtained during a traffic stop, contending the search was not a permissible inventory, but rather a pretextual search after unreasonable impoundment of the vehicle. We vacate the trial court's order and remand with direction.

When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts. This principle is a settled one, and the Supreme Court has identified three corollaries of the principle, which limit the scope of review in appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts. First, an appellate court generally must accept those findings unless they are

clearly erroneous. Second, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court. And third, an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court.

(Citation and punctuation omitted.) *Hill v. State*, 360 Ga. App. 683, 683-684 (859 SE2d 891) (2021). But, we may "consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape." (Citation and punctuation omitted.) *McNeil v. State*, 362 Ga. App. 85 (866 SE2d 249) (2021). In other words, "we owe no deference to the trial court's findings of fact that are plainly discernable from the video[.]" *Snellings v. State*, 371 Ga. App. 795 (903 SE2d 177) (2024).

Thus, viewed in favor of the trial court's judgment, including those facts "indisputably discernable" from the videotape of the traffic stop and search, the record shows that a detective with the Forsyth County Sheriff's Office ("FCSO") was on patrol in May 2021, when he saw a pick-up truck pulling a trailer with no tag and conducted a traffic stop around 1:00 a.m. Two back-up officers arrived shortly

after the stop, and an additional supervising officer arrived later. The detective also noticed that there were grinder marks on the tongue of the trailer that appeared to be used to remove the VIN. Colleen Lynn, the driver, and Huertas, the passenger, told the detective that they had just purchased the trailer from a neighbor and did not have a title or bill of sale with the VIN and that they were heading to a remodeling job to pick up a counter top. Huertas showed the detective "a handwritten bill of sale for the trailer, but it did not have a VIN depicted on it, nor any information for, like, who did he purchase it from." The detective was unable to locate a VIN on the trailer. When the detective ran the tag on the truck, a Ford F150, he discovered that the license plate attached to the truck was a temporary tag out of Ohio that returned to a 2021 Chevrolet Express Van owned by a refrigeration company. The detective then proceeded to run the VIN on the truck and learned it was registered to Colleen Lynn but had "cancelled registration with no valid insurance out of the State of Georgia." When the detective asked Lynn to verify insurance status, she provided an insurance card stating it was active and valid from August 2020 to August 2021, but he was able to determine that it was invalid. According to the detective, it was his general practice to give the driver an opportunity to obtain valid insurance during such a stop. In this

case, the detective reached out to the insurance company, confirmed that coverage had lapsed or been cancelled in January 2021, and gave Lynn the opportunity to obtain insurance to prevent the truck from being towed. Based on the detective's phone call, it seems that Lynn was unable to get valid insurance over the phone at that time. During the call, the detective can be heard stating to the insurance company representative, "so, if she's sitting right in front of me and is able to pay you guys to renew the policy, can she do that? It is 2:00 o'clock in the morning and if not, I'm going to have to tow her truck."

At this point, the detective testified that "a decision had to be made and the vehicle had to be towed or impounded." Neither Huertas nor Lynn was under arrest (Lynn had received traffic citations for removal or falsification of vehicle serial number, failure to maintain insurance, and removing or affixing license plate for purpose of concealing vehicle's identity), and the truck and trailer were pulled over in the right turn lane of the roadway. The detective asked Lynn if there was anything in the truck he should know about and asked for consent to search the truck. Lynn responded, "Is there a reason why?" The detective then announced he was having the truck and trailer towed, asked if there was anything they needed to get out of the

4

truck,[1] and stated he was not going to let them access the vehicle, stating "to be honest, with how sketchy this is . . . there might be something else going on . . . I really don't trust you guys to go through the truck and not have a weapon." Another officer present began explaining that their policy requires them to do an inventory search, and that whatever is removed from the truck at that time is Lynn/Huertas' responsibility and whatever goes with the truck when towed is the police's responsibility. The officer then stated that the reason they are asking if anything is in the truck that is not supposed to be is "one, we want to see how cooperative you are gonna be with us and two, if there is something in there that's not supposed to be in there . . . now you're responsible for it." The detective testified during the hearing that both Lynn and Huertas were asked for permission to search the vehicle because he "believe[d] there was something in the vehicle."

What happened next is disputed by the parties. Huertas asserts that he and the driver "requested to obtain their own tow truck to have the car privately towed, but [the] request was denied." The State, on the other hand, contends that "the record does not support that this request was ever made. From the body worn camera, it

_____

[1] Lynn responded that there were work tools.

5

appears [Huertas] was simply inquiring how to get the vehicle out of the tow yard." The trial court did not make any finding regarding whether Huertas or the driver requested to have the truck and trailer privately towed. This Court's review of the body camera footage shows that after the detective informs Huertas and Lynn that he has to have the truck and trailer towed, Huertas first asks what he would have to do "to get the truck out." The detective explains that they will have to show proof of valid registration and insurance. Huertas then asks a question, which is muffled by the sound of a passing car. Our review of the video shows that Huertas either asks "I can't have a tow truck pick it up and tow it *to* the yard?" or "I can't have a tow truck pick it up and tow it *from* the yard?" (Emphasis supplied.) The detective responds "no" to the question.[2]

The detective and another officer then begin searching the truck's interior, and after nearly one and a half minutes of searching, the other officer comments that he

---

[2] The detective's testimony on this issue is equivocal. He testifies that Lynn and Huertas "did request to get their own wrecker and asked if they [could] have a friend come and tow the vehicle for them." However, the detective thought this "gives no check or balances to the release of that vehicle, which means they can be back on the roadway with that vehicle endangering the general public[.]" But the detective also testified that if they had asked for private towing, "I probably would have allowed them to."

smells marijuana.[3] The detective located approximately one gram of marijuana in a Ziplock bag which was inside a second bag, a "crystalline substance," and several drug-related objects. Huertas does not dispute ownership of the contraband, but the body camera footage seems to show that Huertas only claimed ownership of the brown bag containing the marijuana while the other contraband was found in a separate bag.[4] The entire interaction was captured on the detective's body camera, which was admitted during the hearing.

It is undisputed that neither the detective nor any other officer present completed, or even started, a written inventory of the truck's contents. The detective

---

[3] The detective testified that "we began to inventory the vehicle, but as soon as we opened the driver and passenger door to do so, myself and [another officer] noticed the *immediate* odor of marijuana, and it became probable cause to search for illegal drugs." (Emphasis supplied.) According to the detective, they smelled the odor "[w]ithin 10 seconds" of entering the vehicle. As the trial court states in its order, "[t]he video reveals otherwise." The detective confirmed that when he initially stopped the truck and approached the open passenger-side window, he did not smell any odor of marijuana. He did not smell the odor of marijuana, alcohol, or any other substance on Huertas' person.

[4] Huertas asserts in his brief that the police "located marijuana and methamphetamine in a closed and zippered bag in the vehicle" and that "Defendant claimed possession of the drugs." The trial court's order finds that "[t]he officers ultimately discovered three meth pipes, methamphetamine crystals, and marijuana within the truck's cabin."

admitted that they did not actually complete an inventory sheet,[5] itemizing the property located in the vehicle, because "there was an enormous amount of tools and belongings within the vehicle and it would have taken hours or days to inventory every item. The common procedure with [that] much stuff is to inventory on body cam or let it be seen so that it could be documented." Additionally, the section of the impound sheet titled "Inventory" was filled in with "NO."

After Huertas was charged with possession of methamphetamine and possession of drug-related objects, he filed a motion to suppress the evidence seized during the search of the car. Huertas attached to his motion the FCSO's written policy for impounding vehicles. Huertas asserted that the officers failed to follow the FCSO's written policy for impounding vehicles and conducting an inventory search. According to Huertas, the officer's "sole purpose was to search the automobile for contraband." Following a hearing, the trial court issued a detailed 14-page order denying Huertas' motion. According to its order, the trial court "exhaustively reviewed the entirety" of the video recording of the traffic stop. First, the trial court found that the detective had reasonable and articulable suspicion upon which to stop

---

[5] The detective testified that there is a "written inventory form," but it's "done on a computer," and he did not fill it out in this case.

the truck. The trial court then went on to address the length of the detention, stating, "[a]lthough not readily argued as a basis of the motion, the [c]ourt observes that the length of this stop was of significant duration," but the court ultimately concluded that "the length of detention is not an issue in this case" because the detective spent the time investigating the truck's registration and insurance, the temporary tag, and the trailer. With regard to the detective's decision to impound the truck and trailer, the trial court found that it could only have been based upon OCGA § 40-6-206, which allows a law enforcement officer to remove or cause to be removed an uninsured vehicle under certain circumstances. OCGA § 40-6-206 (d). After concluding that the detective's impoundment decision was reasonable, the trial court addressed whether the officers' initial entry into the vehicle's cabin was an inventory search or a pretextual search. In reaching its decision, the trial court made the following findings:

> Prior to announcing his tow decision, [the detective] informed Lynn that the insurance policy on the truck had lapsed. He then inquired, "Is there anything in the truck that I should know about?" Lynn responded, "No." [The detective] then asked, "Do you have any issue with me searching the truck?" Lynn responded, "Is there a reason why?" [The detective] then announced, for the first time, his decision to have the

9

truck towed . . . . [The detective] explained that if there is something in the truck that they wanted to take with them after the truck was towed that the officers, during their inventory, would take it out for them but under no circumstances would he allow [Huertas] or Lynn access to the truck's interior. He had previously allowed her to access the truck's cabin numerous times, unattended. This inconsistency points to the question as to whether the search began as a true inventory search or was a ruse for an unconstitutional search for contraband. . . . During their initial entry into the truck, neither officer is seen recording or noting the contents of the truck. Instead, they appear to be "rummaging" in the hope of finding contraband.

(Footnote omitted.) Ultimately, the trial court concluded that (1) the FCSO's written policy does not authorize a video inventory procedure; (2) the lack of inventory procedure is not controlling; (3) the officers were not unconstitutionally "rummaging" but began the inventory in good faith; and (4) the inventory search was converted into a probable cause search once the officers smelled marijuana.

At Huertas' request, the trial court certified its order for immediate review. We granted Huertas' application for an interlocutory appeal, and this appeal followed. As he did below, Huertas contends that the impoundment was unreasonable; the officers failed to follow the FCSO's written policy for impounding vehicles and conducting an inventory search; and the inventory search was pretextual.

10

(a) *Impoundment.* As an initial matter, we note that the State does not contest Huertas' standing to challenge the search, nor did it make this objection in the trial court, and thus it is waived. See *Bowden v. State*, 304 Ga. App. 896, 898, n.1 (698 SE2d 372) (2010). See also *Byrd v. United States*, 584 U. S. 395, 410-411 (IV) (138 SCt 1518, 200 LE2d 805) (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits."); *United States v. Ross*, 963 F3d 1056, 1065 (III) (11th Cir. 2020) ("All agree that in the typical Fourth Amendment 'standing' case — in which the controlling question is whether the defendant had a reasonable expectation of privacy in the first place — the government waives any standing objection that it fails to raise.") (citation omitted).

On a motion to suppress, the State bears the burden of proving the legality of a search and seizure. OCGA § 17-5-30 (b). See also *Stroud v. State*, 344 Ga. App. 827, 831 (3) (812 SE2d 309) (2018). "The Fourth Amendment proscribes all unreasonable searches and seizures, and searches conducted without prior judicial approval are per

11

se unreasonable under the Fourth Amendment, subject to specifically established and well-delineated exceptions." (Citation and punctuation omitted.) *State v. Wood*, 367 Ga. App. 10, 12 (2) (884 SE2d 596) (2023). One such exception to the warrant requirement is an inventory search of a vehicle pursuant to lawful impoundment.

> In the interests of public safety and as part of what the [Supreme Court of the United States] has called "community caretaking functions," automobiles are frequently taken into police custody. The police may inventory the contents of a vehicle that has been lawfully impounded, but they may not use an impoundment or inventory as a medium to search for contraband. The individual's right of privacy is superior to the power of police to impound a vehicle unnecessarily.

(Citations and punctuation omitted.) *State v. Carter*, 305 Ga. App. 814, 817 (2) (701 SE2d 209) (2010). Thus, "justification for an inventory search is premised upon the validity of the impoundment of the vehicle." (Citation, punctuation, and emphasis omitted.) *Stroud*, 344 Ga. App. at 832 (3). Accordingly, we first consider whether the impoundment of the truck and trailer in this case was reasonably necessary.

"An officer's decision to impound a vehicle is valid only if there is some necessity for the police to take charge of the property[.]" (Citation and punctuation omitted.) *State v. Loechinger*, 357 Ga. App. 852, 854-855 (1) (851 SE2d 838) (2020).

12

> The ultimate test for the validity of the police's conduct is whether, under the circumstances then confronting the police, their conduct was reasonable within the meaning of the Fourth Amendment. The test is whether the impoundment was reasonably necessary under the circumstances, not whether it was absolutely necessary.

(Citation and punctuation omitted.) Id. at 855 (1).

Here, neither Huertas nor Lynn, the truck's owner, was under arrest, but the truck and trailer lacked valid registration and insurance, and thus could not be legally driven, and were parked in the turn lane of the roadway in the wee hours of the morning. We have found impoundment reasonably necessary under similar circumstances. See *Davis v. State*, 331 Ga. App. 171, 174 (769 SE2d 183) (2015) (holding that trial court did not err by finding that impoundment was reasonable under the following circumstances: the defendant's car was parked on the side of a major road late at night; because there was no proof that the vehicle was insured, towing it was the only viable option for removing it from the roadway; and there was no evidence that the defendant expressed a preference for a towing company); *Staley v. State*, 224 Ga. App. 806, 807 (1) (482 SE2d 459) (1997) (concluding that officer's conduct in impounding the vehicle was reasonable because the defendant's truck was

sitting in the turn lane of the road, no one could have lawfully driven the truck because there was no proof of insurance, and the defendant failed to make any request regarding a wrecker service). In both cases, however, our holding was premised, in part, on the absence of a request by the defendant to obtain or choose his own towing service.[6] *Davis*, 331 Ga. App. at 174; *Staley*, 224 Ga. App. at 807 (1). Indeed, in *Staley*,

---

[6] We addressed a similar issue under a different set of circumstances in *Williams v. State*, 204 Ga. App. 372 (419 SE2d 351) (1992). In that case, an officer initiated a traffic stop and arrested the driver after learning he had a suspended license. Id. at 372-373. The officer testified that he chose to impound the vehicle and conduct an inventory search on the spot because at that early hour he was the only one in the department working and had no other way to secure or do anything with the vehicle, which was located partially on the roadway and partially on the grassy shoulder. Id. at 373. According to the officer, he did not inquire whether or not the driver could make other arrangements for the car's retrieval and did not recall the driver asking for a private wrecker but stated that whenever a reasonable request was made, he did not deny it. Id. The driver, on the other hand, testified that the officer refused his request to call someone to take the car, either one friend half a mile away who could walk over or another friend with a wrecker. Id. The trial court denied suppression, concluding that the officer's being on duty alone at that time of night necessitated the officer's impounding the car by use of the standard tow truck company and that the officer had no other reasonable alternatives presented. Id. But, the court did not make a specific finding as to whether or not it accepted the driver's version of events, i.e., that he requested to call someone to retrieve the vehicle. Id. On appeal, the driver argued that the impoundment and inventory were invalid because there were other reasonable alternatives for retrieval and removal of his car. Id. This Court concluded that the officer's failure to explore or pursue any alternatives and to impound the vehicle instead was reasonable under the circumstances: the driver was under arrest and had no valid license; there were no other passengers; the car was in a dangerous position on the roadway; it was the middle of the night and the officer could not readily

the defendant argued on appeal that "he should have been permitted to choose his own wrecker service instead of being forced to use the one called by the police," but we found no evidence that he had made such a request. 224 Ga. App. at 807 (1). In this regard, we have "adopted the view that when a driver is arrested and a reliable friend is present who may be authorized and capable of removing the vehicle, or where the arrestee expresses some preference for a private towing service, the rationale for impoundment does not exist." (Citation and punctuation omitted.) *State v. Lowe*, 224 Ga. App. 228, 230 (480 SE2d 611) (1997). Compare *Ahmad v. State*, 312 Ga. App. 703, 706 (1) (719 SE2d 563) (2011) (when given the opportunity, defendant expressed no preference regarding towing companies and allowed police to make the towing arrangements; "[t]herefore, it was necessary for the police to exercise at least temporary dominion over the vehicle"); *Waggoner v. State*, 228 Ga. App. 148, 149 (1) (491 SE2d 88) (1997) (same). But see *Askew v. State*, 326 Ga. App. 859, 861 (755 SE2d 283) (2014) ("[p]olice officers are not required to ask whether an arrestee desires to

---

summon assistance to help move the car or provide backup in the event the driver's alternatives created a security problem. Id. at 374. In reaching this holding, we stated that "[w]hether or not [the driver] did suggest to the officer any alternative to impoundment was for the trial court to decide as finder of fact," and we assumed that the trial court found that the driver suggested alternatives to the officer. Id.

have someone come and get the car, nor are they required to accede to an arrestee's request that they do so") (citation and punctuation omitted); *Armstrong v. State*, 325 Ga. App. 690, 691 (1) (754 SE2d 652) (2014) ("officer was not required under [the] circumstances to ask what [the defendant] wanted done with the car prior to impounding it").

In sum, whether impoundment was reasonably necessary appears to depend on the circumstances, including whether private towing was requested. In this case, whether Huertas made such a request is disputed. Because we cannot definitively ascertain from the video what Huertas asked, and given our decision in Division (b), infra, we vacate this portion of the trial court's order and remand with direction to the trial court that it make such a finding in the first instance and reconsider its conclusion that impoundment was reasonably necessary based on all of the circumstances. See *Hill*, 360 Ga. App. at 683 ("When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts.") (citation and punctuation omitted). See also *State v. Jones*, 371 Ga. App. 445, 450-451 (2) (900 SE2d 749) (2024).

(b) *Inventory search.* "The United States Supreme Court has held that an inventory search may be reasonable under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause." (Citation and punctuation omitted.) *Capellan v. State*, 316 Ga. App. 467, 469 (729 SE2d 602) (2012). But, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U. S. 1, 4 (110 SCt 1632, 109 LE2d 1) (1990). "Inventories conducted by the police pursuant to standard police procedures are deemed to be reasonable under the Fourth Amendment." (Citation and punctuation omitted.) *Capellan*, 316 Ga. App. at 470.

> The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime. . . . Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.

*Wells*, 495 U. S. at 4.

With regard to an inventory incident to impoundment, the FCSO's policy provides:

17

## C. VEHICLE IMPOUND INVENTORY AND RECORD

Whenever a vehicle or other equipment is to be released to a towing company for storage, the seizing or impounding deputy shall provide pertinent data concerning the impounded item and complete the necessary paperwork (i.e., vehicle impound record for and evidence/property form). After completing the necessary paperwork, the wrecker service shall take possession of the vehicle, keys, and a copy of the vehicle impound record.

1. Items of Exceptional Value Located in Vehicles.

a. In cases where items of exceptional value are present at the scene of an arrest or impound (which are not contraband or of evidential value), the arresting deputy shall make every effort to turn those items over to a person of the arrestee's choosing. This exchange shall be detailed in the incident report documenting the arrest. It is the arresting deputy's responsibility to minimize the Sheriff's Office's involvement in matters which have no bearing on a criminal proceeding.

b. In cases where the vehicle is being impounded and no arrangement can be made to secure their property, the property will be documented in the inventory section of the vehicle impound/release record and secured in the arrestee's vehicle prior to the wrecker company taking possession of the vehicle.

c. In cases where there is no vehicle to leave an arrestee's property in or no person to turn the property over to, the

property will be documented on a Property Receipt Form and turned into the Property/Evidence section of Subsection C deals with release of vehicles/other equipment which has been seized. Part 3 provides: "Private request wrecker service(s) do not require an impound slip be completed by the deputy."

This is the entirety of the policy regarding an inventory search. The State contends that the FCSO policy did not require the detective to complete a written inventory. Rather, according to the State, the policy "only requires that items of exceptional value . . . be documented in the inventory section of the vehicle impound/release record when no arrangement can be made to secure [the] property." (Emphasis omitted.) Essentially, under the State's reading of the policy, officers are allowed to search the vehicle but not actually inventory its contents unless they determine there is something of "exceptional value."

First, we have concerns whether such a policy satisfies the Fourth Amendment. See *Wells*, 495 U. S. at 4 ("[t]he policy or practice governing inventory searches should be designed to produce an inventory"); *South Dakota v. Opperman,* 428 U. S. 364, 384 (96 SCt 3092, 49 LE2d 1000) (1976) (Powell, J., concurring) (explaining that in a proper inventory search, "no significant discretion is placed in the hands of the individual officer: he [or she] usually has no choice as to the subject of the search or

19

its scope"). See also *United States v. Lyons*, No. 1:21-CR-00398-VMC-LTW, 2023 WL 4566529, at *5 (N.D. Ga. July 14, 2023) ("An inventory list cannot serve its purpose of protecting the owner's property and protecting the police from disputes over lost property if most of the items are not listed . . .; an inventory search is not per se invalid if the inventory list fails to include every single item") (citation and punctuation omitted). Further, even if this is what the policy actually provides, and we assume such a policy does satisfy the Fourth Amendment, there has been no showing by the State that there were *not* items of "exceptional value" in the truck and trailer such that a written inventory was not required. To the contrary, the record shows that the truck/trailer contained a substantial amount of tools, some of which could be considered items of "exceptional value." In other words, even if we accept the State's argument in this regard, the State has not shown that the detective followed the written FCSO policy in conducting the inventory search.

If, on the other hand, the FCSO policy intends that a written inventory should be prepared whenever a vehicle is impounded, the detective likewise failed to follow the written FCSO policy. It is undisputed that no such inventory was prepared. Instead, the detective testified during the hearing that the "common procedure with

[that] much stuff is to inventory on body cam or let it be seen so that it could be documented," but the written FCSO policy does not mention taking an inventory via body camera footage. The trial court, in its order, noted this testimony and made the following findings:

> there is no evidence video inventory procedure is a written departmental policy within the general order. Instead, it is merely the officer's statement. . . . [T]he general order contemplates that the inventory shall be completed *prior* to the wrecker leaving the scene. It is unclear how the officer's body camera footage would be provided to the wrecker service prior to towing.

(Emphasis in original.) Citing this Court's decision in *Capellan*, the trial court then concluded that

> [t]he police department may well have had such a reasonable inventory procedure in circumstances such as this. But there must be evidence, other than the testimony of the roadside deputies to establish the existence of such a policy or procedure. Without evidence of such policy it is difficult, if not impossible, to conclude that the inventory was conducted pursuant to such policy and not simply a rummaging to discover incriminating evidence. Without supporting evidence other than the officer's testimony, the inventory search is considered unreasonable under the Fourth Amendment.

(Punctuation and footnote omitted.) Thus, the trial court was under the impression that the detective's testimony alone could not provide evidence of an unwritten policy or practice. This was a misapprehension of the law.

In *Capellan*, the record contained no evidence about the police department's policy or procedures on inventory searches. 316 Ga. App. at 470. "Rather, both officers simply testified that their searches of the wrecker, van, and its contents were inventory searches pursuant to the impoundment." Id. Our opinion does not state that the officers testified that their searches were performed pursuant to the department's policy or even testified as to the existence of any such policy. There simply was "no evidence in the record to establish the existence of such a policy or procedure." Id. Nothing in our decision suggested that an officer's testimony alone could not establish the existence of a policy or practice.

To the contrary, federal circuit courts have consistently held that an officer's testimony may establish the existence of an unwritten policy or practice. See, e.g., *United States v. Hawkins*, 279 F3d 83, 86 (II) (A) (1st Cir. 2002) (stating "a standardized inventory policy may be unwritten" and affirming district court's denial of motion to suppress based on finding that there was a standardized, albeit unwritten,

22

inventory policy compelling officers to open containers to determine their contents during an inventory); *United States v. Lowe*, 9 F3d 43, 44 (8th Cir. 1993) (rejecting defendant's contention that the search of his vehicle was an unlawful inventory search because the government failed to introduce a *written* policy because officer's testimony that it was the department's policy to impound and inventory vehicles of persons taken into custodial arrest was sufficient); *United States v. Skillern*, 947 F2d 1268, 1275 (IV) (5th Cir. 1991) (oral testimony regarding policy sufficient); *United States v. Kordosky*, 921 F2d 722, 723-724 (7th Cir. 1991) (although no written inventory policy, testimony regarding standard practice sufficient).

In sum, we are unable to address the question on appeal because the trial court did not make a finding with regard to the existence of an unwritten policy as testified to by the detective, which, if credible, is relevant to a determination of whether the detective complied with standardized policy in conducting the inventory search in this case. As an appellate court, we must limit our consideration of the disputed facts to those expressly found by the trial court, *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015), and "it is not within the province of this [C]ourt to make our own findings on [this matter]." (Citation and punctuation omitted.) *State v. Johnson*, 364

23

Ga. App. 50, 52 (3) (873 SE2d 709) (2022). We therefore vacate this portion of the trial court's order and remand the case with direction that the trial court determine the credibility of the detective's testimony, and make findings of fact as to whether an unwritten FCSO policy or practice existed, allowing officers to use body camera footage to create an inventory, and if so, whether the detective complied with such a policy in this case.[7] See *State v. Jones*, 371 Ga. App. 445, 450 (2) (900 SE2d 749) (2024) (vacating and remanding where trial court's order acknowledged certain testimony by the officer necessary for establishing probable cause to arrest, but offered no guidance as to whether it found that testimony credible).

*Judgment vacated and case remanded with direction. Dillard, P. J., and Padgett, J., concur.*

---

[7] "The trial court [is] not required to accept [the detective's] testimony on [this] issue[ ], even though it was not contradicted." (Citation and punctuation omitted.) *Johnson*, 364 Ga. App. at 52 (3).